Zenobia TOLIVER, Montravian
Martin, and Marcus Holloway,
Appellants,

v.

TEXAS DEPARTMENT OF FAMILY
AND PROTECTIVE SERVICES,
Appellee.

No. 01–06–00292–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 26, 2006.

Christine L. Mangle, Texas City, TX, Lynette K. Briggs, Hitchcock, TX, Ronda Elizabeth Harris, Julie A. Ketterman, Julie A. Ketterman, PLLC, Houston, TX, Susan M. Edmonson, Seabrook, TX, for Appellants.

Kurt Sistrunk, Criminal Dist. Atty., Galveston County, Galveston, TX, for Appellee.

Panel consists of Justices NUCHIA, JENNINGS, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

In this accelerated appeal,[1] appellants, Zenobia Toliver, Montravian Martin, and Marcus Holloway, challenge the trial court's order, entered after a bench trial, terminating their parental rights to their respective minor children, D.H., Z.M., and A.R.[2] In six issues, Toliver contends that the evidence is legally and factually insufficient to support the trial court's findings that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the

---

1.  *See* TEX. FAM.CODE ANN. § 263.405(a) (Vernon Supp.2005).

2.  Toliver's three minor children were conceived by three different fathers. Toliver appeals the termination of her parental rights to her children, D.H., Z.M., and A.R. Martin appeals the termination of his parental rights to his child, Z.M. Holloway appeals the termination of his parental rights to his child, D.H. The father of the third minor child, A.R., does not appeal the termination of his parental rights.

children;[3] she failed to support the children in accordance with her ability during a period of one year ending within six months of the filing of the petition;[4] she constructively abandoned the children, who had been in the temporary managing conservatorship of the Department of Family and Protective Services ("DFPS") for not less than six months;[5] she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children;[6] she used a controlled substance in a manner that endangered the health and safety of her children and failed to complete a court-ordered substance abuse treatment program;[7] and the termination of the parent-child relationship between Toliver and her children was in the children's best interest.[8]

In two issues, Martin contends that the evidence is legally and factually insufficient to support the trial court's findings that termination of the parent-child relationship between Martin and Z.M. was in Z.M.'s best interest[9] and that the trial court erred in terminating his parental rights to Z.M. on the basis that he did not timely file an admission of paternity.[10]

In three issues, Holloway contends that the evidence is legally and factually insufficient to support the trial court's findings that "he engaged in any conduct or knowingly placed or allowed [D.H.] to remain in conditions or surroundings which endangered the physical or well-being of [D.H.],"[11] he "had his parent-child relationship terminated with respect to another child based on findings that the parent's conduct was in violation of Paragraph (D) or (E) ...,"[12] and termination of the parent-child relationship between Holloway and D.H. was in D.H.'s best interest.[13]

We affirm the order in part and reverse and remand in part.

## Factual and Procedural Background

Katy Leacroy, the DFPS case worker originally assigned to the case, testified that, at the time of trial, D.H. was ten-years old, Z.M. was eight-years old, and A.R. was four-years old. Leacroy stated that D.H. suffers from osteogenesis imperfecta, also known as "brittle bone," is confined to a wheelchair, and has fragile bones subject to being easily broken.

### Toliver

Leacroy began working with Toliver in July 2003 because of allegations of medical neglect, narcotics use, and "domestic disturbances between [Toliver] and boyfriends." DFPS received "several reports ... that [Toliver] was ... snorting cocaine," and Leacroy learned of an allegation that after D.H. had broken his legs at school, he "wasn't taken to the hospital immediately." DFPS requested that Toliver undergo narcotics testing and take parenting classes. Toliver initially stated that she did not need parenting classes, denied narcotics use, and refused substance abuse services. During the year

3. *See* TEX. FAM.CODE ANN. § 161.001(1)(E) (Vernon Supp.2005).

4. *See id.* § 161.001(1)(F).

5. *See id.* § 161.001(1)(N).

6. *See id.* § 161.001(1)(O).

7. *See id.* § 161.001(1)(P).

8. *See id.* § 161.001(2).

9. *See id.*

10. *See id.* § 161.002(b)(1).

11. *See id.* § 161.001(1)(D).

12. *See id.* § 161.001(1)(M).

13. *See id.* § 161.001(2).

before DFPS sought custody of the children, Toliver "failed to submit urine samples on several occasions." Toliver subsequently agreed to a drug and alcohol evaluation only after DFPS decided "to pursue court action."

DFPS introduced into evidence Toliver's records from "Turning Point," a substance abuse treatment program. These records reflect that counselors had made home-based visits to conduct random narcotics tests on February 20, 2004 and March 12, 2004 and that Toliver refused those tests, stating that "if she never submitted a urinalyses she would never be submitting a positive sample." On March 29, 2004, during another home-based visit, although Toliver was not home, the counselor was told that Toliver "continues to use mood altering chemicals and comes and goes regularly." Counselors made home visits on May 18, 2004, May 28, 2004, and June 28, 2004, and Toliver was not home or did not answer the door. Counselors left notes requesting Toliver to contact Turning Point. On July 28, 2004, a counselor called DFPS and obtained a new address for Toliver in Galveston. When Toliver was finally tested in August 2004, she tested positive for cocaine on August 17, 23, 27, and 30.

On September 21, 2004, Toliver and Holloway agreed to a mediated settlement agreement with DFPS, which was incorporated into a court order, wherein DFPS was named managing conservator of the children, Toliver was ordered to pay child support in the amount of $40 per month for Z.M. and A.R., and Holloway was ordered to pay child support in the amount of $100 per month for D.H. The mediated settlement agreement required Toliver to follow all recommendations made as a result of a narcotics evaluation, and Toliver was specifically ordered to take a urinalysis "today" and to "go inpatient" if the results were positive. The agreement ad-

monished Toliver that a "failure to comply with the terms and conditions of this agreement" could result "in additional orders" and that Toliver's parental rights could "be restricted or terminated" if she was unable to provide the children with a safe environment. On October 14, 2004, the trial court again ordered Toliver to take a urinalysis and to submit to inpatient treatment if her results were positive or attend substance abuse meetings "seven days a week" if her results were negative.

On cross-examination, Leacroy agreed that Toliver was not present at school when D.H. broke his legs. She acknowledged that Toliver had "completed parenting" classes. Leacroy also agreed that she not an active participant in the case after the mediation. Leacroy conceded that DFPS's removal of the children from Toliver's home was not based on any actions by Martin and that DFPS had not requested any services of Martin.

Sheri Brewster, the DFPS case worker for the children since October 2004, testified concerning Toliver's records from the ADA Women's Center, an inpatient drug treatment facility. These records, which were admitted into evidence, reflected that Toliver was admitted to inpatient treatment at ADA on November 22, 2004, but was quickly discharged on November 29, 2004. Brewster stated that inpatient treatment lasts normally "27 to 30 days minimum." The ADA records include the following comments regarding Toliver's treatment:

> After it was reported that client made verbal threat towards another client, first towards client and then repeated this threat to two different staff persons, client was discharged for noncompliance after review of this incident along with client's negative and hostile behaviors. Client has not been focused on treatment objectives and had made it clear

she was in treatment for [Child Protective Services ("CPS")] only.

DFPS entered into evidence a February 11, 2005 permanency plan and permanency progress report, which states that Toliver had not been visiting her children on a regular basis because she was "too busy." The report further states that "due to tension" between Toliver and the relative with whom the children were placed after DFPS was named managing conservator, any future visits would have to be scheduled at the DFPS office. Finally, the report reflects that at a prior permanency plan meeting, Toliver had become "extremely angry and began shouting profanity repetitively at the care giver" and that Toliver "had to be escorted out of the building by security."

The trial court, in a February 17, 2005 permanency hearing order, again ordered Toliver to "go today and take [urinalysis]" and also "to get anger management counseling" and to attend "Women's Resource Crisis Center victim classes."

DFPS introduced into evidence a May 12, 2005 permanency plan and permanency progress report, which summarizes Toliver's substance abuse and treatment history. The report states,

Toliver went to inpatient at ADA House for 10 days, was discharged for fighting in the facility without successful completion. A new program was located and when the bed became available [Toliver] stated she was working and was unable to go inpatient but would attempt to go outpatient treatment. As of the end of January [Toliver] began participating in intensive outpatient treatment through the Gulf Coast Center program. As of the end of April Toliver was discharged and recommendations were made for inpatient treatment as she tested positive for cocaine on 3/9/05, 3/30/05 at both Turning Point and Gulf

Coast and on 4/20/05. Ms. Toliver refused to go to inpatient....

Ms. Toliver had a visit on March 25, 2005 with her children where she was extremely anxious and agitated as well as highly emotional. Brewster ... had to warn Toliver to calm down or the visit would be terminated. Toliver appeared to the workers to have been high. Toliver tested positive for cocaine five days later.

Toliver has completed her psychological evaluation.... However with her current lack of interest, failure to accept responsibility, defensiveness and hostility she is quite unlikely to participate in or benefit from these services.... Toliver may participate in services to the extent that she is required in order to regain custody of her children, but it is unlikely that she will make significant changes .... [l]ong term monitoring of her parenting is recommended if she regains custody of her children.

Toliver has begun counseling and has been extremely inappropriate and aggressive with counselor during at least one session. The counselor ... had feared she could become violent during the exchange.

Toliver has also been attending anger management classes. The worker spoke with the counselor and was told that Toliver has [been] disruptive ... and will not be getting a certificate of completion.... The counselor stated that although Toliver has the tools to control herself that it will be unlikely that she will ever utilize them due to her personality.

The report further reflects that security guards at the building where Toliver attended classes "reported numerous problems" with Toliver. The report concludes that "progress has not been made as Toliver continues to use drugs and test positive

for cocaine" and that "Toliver is still unable to maintain a safe and stable home for the children."

DFPS introduced into evidence a May 27, 2005 permanency hearing order, which states that Toliver had "not demonstrated adequate and appropriate compliance with the service plan." The court again ordered Toliver "to go inpatient." The court stated that if Toliver went to inpatient treatment, it would grant an extension, but that if Toliver did "not successfully complete rehab," her case would "go to termination." Brewster stated that after this order was signed, Toliver did go to and complete an inpatient program, and that the case was extended as a result.

DFPS, pursuant to a business records affidavit, then introduced Gulf Coast Center ("GCC") records, which reflect that Toliver received follow-up outpatient treatment at GCC beginning in late July 2005 after completing inpatient treatment at a facility in Brazosport. Toliver's "client profile" states, "Presenting problem. Client has been in treatment at [GCC] outpatient but recently tested positive for cocaine and reports daily use of alcohol." An assessment summary reflects that Toliver had reported that she was living with her sister who was "spending her SSI and food stamps on crack/powder cocaine," and Toliver had also stated that "all her family does drugs." A GCC progress report states that "client progress stalled," that Toliver tested positive for cocaine and PCP on August 8 and 11, 2005, and that Toliver had "relapsed on cocaine." A progress note dated August 18, 2005, states that Toliver "became hostile" when asked to discuss how her choices prompted DFPS involvement, that Toliver appeared "unwilling to work on her accountability and continues to blame others for her circumstances," and that Toliver "refuses to

talk about the difficulty of staying clean and sober despite the dire outcome of her continued use." An August 24, 2005 report states that Toliver "was unable to complete this group" and that Toliver "became combative, threatening and cruel in an angry outburst" and was asked to leave the building and not return. An August 24, 2005 progress note states that Toliver "continues to present a threat to group safety."

On August 31, 2005, representatives from GCC and DFPS held a "crisis team intervention" with Toliver. A report from this crisis intervention states that Toliver's "progress has stalled," that "other options for treatment were explored due to [Toliver's] positive [urinalysis]," but that Toliver "reported she would not return to residential treatment nor did she want GCC services." Toliver also "reported she was moving to Houston tonight and would be seeking services in Houston," and a "CPS rep informed client that she was not given permission to leave treatment and that treatment … must be pursued wherever client chose to move." The final GCC report concludes that Toliver "refuses to own her use of PCP and appeared irritated and indignant at being drug tested." Toliver, then discharged from GCC, never contacted Brewster again, although Brewster stated that Toliver knew how to get in touch with her. Brewster further stated that Toliver's last contact with her children was in March 2005, and that it had been "basically a year" since Toliver had seen her children.[14] Toliver also never paid child support.

DFPS then introduced evidence that Toliver had been charged with misdemeanor assault on May 26, 2005 and was placed on community supervision. Brewster testified that Toliver had endangered her chil-

---

14. The case was tried to the bench in February 2006.

dren by using narcotics and engaging in criminal activity, that Toliver did not support the children as ordered during the pendency of the case, and that Toliver had not maintained significant contacts with her children.

At the time of trial, DFPS had placed D.H. in a therapeutic foster home and placed Z.M. and A.R. together in another foster home. The children visited each other regularly and were "doing extremely well." D.H. bonded with his foster parents and Z.M. and A.R. bonded with D.H.'s foster parents. D.H.'s foster parents intended to adopt D.H. and A.R., and DFPS would place Z.M. in the same home as her siblings to give Z.M. time to adjust and to give the foster family the opportunity to address Z.M.'s behavioral problems. Brewster reported that Z.M. "has rages," and she noted that D.H.'s foster family is "primarily a medical needs home so they don't want to risk [Z.M.] injuring any of the children in the home." However, the foster family was "willing to have [Z.M.] as a foster child to keep all three together to see if they are able to adopt all three."

Brewster further testified that she was not aware that D.H.'s grandmother, Shirley Joseph, was a possible placement until trial, that at a December 2005 hearing, the trial court ordered that Joseph could have a supervised visit with D.H., and that the visit occurred. However, Joseph had not contacted Brewster since the visit, and DFPS still sought termination based on the facts that D.H. has special needs, he has bounced between family members his whole life, he is in a therapeutic home that cares for him, and he is starting to get specialized treatment for his brittle bone condition for the first time in his life from Texas Children's Hospital ("TCH"). Although Brewster expressed concerns about D.H.'s safety in Joseph's home, she was not opposed to Joseph continuing to see D.H. after termination.

On cross-examination, Brewster agreed that Toliver completed a psychological evaluation and an anger management course and that she went to counseling. Brewster also agreed that, if Holloway and Toliver were never married, Holloway would not have had any right to take D.H. away from Toliver. Brewster agreed that, at the present time, no one was willing to adopt Z.M.

Stacy Faught, D.H.'s foster mother, testified that D.H. had been living in her home since January 2005, that her home is termed a "habilitative primary medical needs foster home," that she had a lot of experience in dealing with special needs children, that she received special medical training in caring for D.H., and that she and her husband wanted to adopt D.H. and A.R. In regard to Z.M., Faught was not sure as to whether her family could meet both D.H.'s and Z.M.'s needs because Z.M.'s needs were more "therapeutic." Faught explained that it was potentially unsafe for Z.M. to be around D.H. due to D.H.'s brittle bone condition because Z.M. had "outbursts" and you could not tell when she would "get mad and hit." D.H. was currently on two types of medications, was receiving bone fusion treatment at TCH, and had not been receiving this fusion treatment prior to being placed with Faught. At the time of trial, D.H. saw his sisters, on average, once a month, but sometimes several times a month. Faught also stated that multiple therapists visit their home and that she receives help from many others in caring for her foster children on a daily basis. Faught and her husband had bonded with D.H., her husband and D.H. were "very close," and D.H. was involved in a special baseball league.

Toliver testified that she went to treatment for thirty days, attended anger man-

agement classes, "did victim awareness," and "did a parent class." She had received counseling, but after she moved to Houston, she had not done anything else. Toliver moved to Houston five months before trial and got an apartment and a job. Toliver admitted that she had a narcotics problem and stated that the last time she used narcotics was when she left treatment in Galveston. Toliver explained that she still needed time to get herself together and to "make sure she [could] stay clean," so she wanted her kids to be placed with a family member, namely Joseph.

Toliver had received special training to care for D.H., and, prior to DFPS taking custody, she had been D.H.'s primary care giver, except for times when his "daddy came and got him once in a while." Toliver last contacted DFPS in October 2005 to provide her new address and had not seen her children since Easter in 2005. Toliver stated that she was currently employed at Sonic, that her rent was cheap, and that she had a one-bedroom apartment. The last time that Toliver took a drug test was in August 2005.

Joseph testified that she is D.H.'s grandmother, that she was present at D.H.'s birth, that she has received training to care for D.H., and that D.H. knows Joseph is his grandmother. She first became aware that D.H. was in a foster home when she attended a hearing in December 2005, and it was her understanding that she would "have visits" and that DFPS was going to conduct a home study on her house. However, DFPS never performed the home study. She had one visit with D.H. since December, and although she wanted another visit, she did not ask for one and no one explained to her how the next visit would take place. Joseph had visited with Z.M. and A.R., she thought it was a "wonderful idea" for her to be managing conservator for all three children, and she was willing to undergo more training to care for D.H.

On cross-examination, Joseph admitted that she is currently paying her bills with help from the county. Although she has only one bedroom, she stated that she could move to a bigger place with help from the county. Joseph, who was separated from her husband, was not currently working due to a tail bone injury, but intended to return to work. When asked who would take care of the children when she returned to work, Joseph stated that she would try to put them in child care, but also stated that she "would probably be at home with [D.H.] so he would be protected since he has brittle bones." She would still work, but would "fix it where when [the children] go to school [she] would be at work." When asked if she could take off work and drive D.H. to TCH in Houston for bone fusion treatment, she stated that she "probably couldn't at this present time," but thought she might get some help from the county. Joseph stated that other family members had also offered to help care for the children and provide financial support. Joseph conceded that both of her daughters had their children removed by DFPS, that she had offered her home to those children, and that she did not pass a DFPS home study. Joseph conceded that her daughters would not help her care for the children.

Jarvis Thomas, Holloway's father, testified that he had offered to help Joseph with the children and that he could lift D.H. for transportation purposes. Thomas, who was not currently employed due to medical problems, stated that he lived in Houston. He contended that when he returned to work, he could work around his schedule to transport D.H. to Houston for his treatments.

## Holloway

DFPS introduced evidence that Holloway had been convicted of robbery and sentenced for a period of two years. Brewster testified that since October 2004, Holloway had not visited D.H. and had never called to request a visit. Brewster explained that Holloway had constructively abandoned D.H. and had not regularly visited or maintained significant contacts with D.H. On cross-examination, Brewster noted that Holloway had previously called DFPS regarding Toliver's treatment of D.H. in an effort "to take D.H. out of a dangerous situation."

Holloway, who was currently incarcerated, testified that he had received special training to care for D.H. and that he was present at D.H.'s birth. Holloway had been concerned about Toliver's treatment of D.H. and had called DFPS on multiple occasions. On one occasion, DFPS removed D.H. and placed him with Holloway, but then returned D.H. to Toliver. Holloway also contacted DFPS with concerns that D.H. was not dressed properly, and stated that he had tried to remove D.H. from a "dangerous situation." While incarcerated, Holloway enrolled in the "Mineral Wells Pre-parole program," and had signed up for electrician and carpentry classes. Holloway explained that he had received probation for robbery, but that his probation had been revoked in November 2004 because he tested positive for cocaine. After the mediation with DFPS, he was to be considered for placement, but DFPS never performed a home study. Holloway stated that he loves his son very much, and that he had signed papers giving permanent managing conservatorship to his mother so that the children could stay together.

## Martin

Brewster testified that although Martin is "an alleged father," Martin never visited Z.M. during the case and Martin never contacted her to arrange a visit. Brewster also stated that she had never seen Martin until he appeared at trial, that Martin had been served but did not timely file an admission of paternity, and that Martin had not paid any child support. The parties stipulated that Martin had a criminal record. On cross-examination, Brewster agreed that Martin was not a party to the mediated settlement agreement.

Martin testified that although he had never been adjudicated the father of Z.M., he was in fact Z.M's father. Martin stated he had been involved with Z.M. for most of Z.M.'s life, that when he got out of prison in 2006, he had "been there," and that for the "past like two years" and "about eight months prior to her being taken" he had visited Z.M. "every weekend." Martin had a good relationship with Z.M. and he loves his daughter. He provided Z.M. with dolls and "dress up stuff." DFPS never contacted Martin after taking Z.M. into custody, and he did not contact DFPS because he "didn't know any contact numbers" and did not know he had the right to see Z.M. Martin stated that he had relatives who would be interested in raising Z.M., including a sister and two cousins, and that his sister and cousins did not have a record with DFPS or criminal histories. Martin explained that he first discovered that DFPS was seeking to terminate his parental rights on January 31, 2006. Martin wanted all three children to stay together, and he was willing to sign away conservatorship to Joseph. Martin stated that although he was currently incarcerated, he would be willing to work and pay child support when he was released from prison. He explained that he wanted to stay in Z.M.'s life.

On cross-examination, Martin admitted that he had several pending criminal cases against him, including the offenses of un-

authorized use of a motor-vehicle, assault, and possession of marijuana. Martin also admitted that he had been in jail for nine months since June 2000 and, during this time, he had no contact with Z.M. Martin had been in jail five or six times during the eight years of Z.M.'s life, and was in prison from 1997 to 2000. Between September 2004 and June 2005, Martin visited Z.M. every weekend at the home of Toliver's niece. During this time, although Martin knew that Z.M. was in DFPS's custody, he never contacted DFPS.

### The Trial Court's Findings

The trial court visited with D.H. in chambers and, at the conclusion of the trial, orally ordered the parent-child relationship between appellants and the children terminated. On March 3, 2006, the trial court signed an order terminating the parental rights of appellants and appointing DFPS as the children's sole managing conservator. In its order, the trial court terminated Toliver's parental rights based on findings that she violated Texas Family Code section 161.001(1)(E), (F), (N), and (O),[15] and that termination was in the children's best interest.[16] The trial court terminated Holloway's parental rights based on findings that he violated section 161.001(1)(D), (F), (N), and (O),[17] and that termination was in D.H.'s best interest.[18] In regard to Martin, the trial court terminated "any parental relationship" between Martin and Z.M. "that may exist" based on findings that Martin, after being served, did not timely file an admission or counterclaim of paternity[19] and that termination was in Z.M.'s best interest.[20]

### Standard of Review

■ A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982). The United States Supreme Court has emphasized that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). Likewise, the Texas Supreme Court has concluded that "this natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985). Consequently, termination proceedings must be strictly scrutinized, and "involuntary termination statutes are strictly construed in favor of the parent." *Id.*

■ Because termination "is complete, final, irrevocable, and divests for all time that natural right . . . the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Id.* (citing *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *Richardson v. Green,* 677 S.W.2d 497, 500 (Tex.1984)). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex.2002). Because ter-

---

**15.** *See* TEX. FAM.CODE ANN. § 161.001(1)(E), (F), (N), (O).

**16.** *See id.* § 161.001(2).

**17.** *See id.* § 161.001(1)(D), (F), (N), (O).

**18.** *See id.* § 161.001(2).

**19.** *See id.* § 161.002(b)(1).

**20.** *See id.* § 161.001(2).

mination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–66.

■ Instead, in conducting a legal sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which the State bore the burden of proof. *See id.* at 266. In viewing the evidence in the light most favorable to the judgment, we "must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could [have done] so," and we "should disregard all evidence that a reasonable fact finder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex.2005) (citing *In re J.F.C.*, 96 S.W.3d at 266).

■ In conducting a factual sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including both evidence supporting and evidence contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which the State bore the burden of proof. *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex.2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not rea-

sonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* at 266.

### Sufficiency of the Evidence

*Termination of Toliver's Parental Rights*

In her first issue, Toliver argues that the evidence is legally and factually insufficient to support the trial court's finding that she "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the children" because "she did not abuse illegal drugs around her children" and her "criminal activity is limited." *See* Tex. Fam.Code Ann. § 161.001(1)(E) (Vernon Supp.2005). In her sixth issue, Toliver contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship was in the children's best interest. *See* Tex. Fam.Code Ann. § 161.001(2). DFPS agrees that although there is some evidence of assault and medical neglect, "the primary focus" is Toliver's narcotics use. DFPS argues that the "persistency of Toliver's drug use and her apparent inability or unwillingness" to complete treatment supports termination of her parental rights.

■ In proceedings to terminate the parent-child relationship brought under Texas Family Code section 161.001, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (Vernon Supp.2005). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human*

*Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

### *Endangerment*

▮▮▮▮▮▮▮ The trial court, in ordering the termination of Toliver's parental rights, expressly found that Toliver "engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the children." TEX. FAM.CODE ANN. § 161.001(1)(E). "Endanger" means to expose to loss or injury or to jeopardize. *Boyd,* 727 S.W.2d at 533. Although such endangerment requires more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.-Fort Worth 2003, no pet.). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the child's birth. *In re D.M.,* 58 S.W.3d 801, 812 (Tex.App.-Fort Worth 2001, no pet.). Moreover, the specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd,* 727 S.W.2d at 533; *In re R.W.,* 129 S.W.3d 732, 738 (Tex.App.-Fort Worth 2004, pet. denied).

▮▮▮▮ Narcotics use, in some circumstances, may give rise to termination under section 161.001(1)(E). *Robinson v. Tex. Dep't of Protective & Regulatory Servs.,* 89 S.W.3d 679, 686–87 (Tex. App.-Houston [1st Dist.] 2002, no pet.). Evidence of narcotics use and its effect on a parent's life and her ability to parent may establish that the parent has engaged in an "endangering course of conduct." *See In re R.W.,* 129 S.W.3d at 739. For example, in *Robinson,* a mother was arrested for the offense of possession of cocaine and placed on community supervision for three years. 89 S.W.3d at 682. The mother signed a family service plan, agreeing to avoid criminal activity and submit to narcotics testing. *Id.* After the mother tested positive for cocaine, the district court revoked the mother's community supervision. *Id.* This Court concluded "that appellant's illegal drug activity, a violation of community supervision after agreeing not to commit such acts in the plan . . ., established clear and convincing proof of voluntary, deliberate, and conscious conduct that endangered the well-being of her children." *Id.* at 686–87.

Similarly, in *In re R.W.,* the evidence demonstrated that the parent "continually struggled with alcohol and drug abuse throughout the years prior to [the child's] birth" and that the parent's "substance abuse and/or mental instability was so excessive that he required medical assistance or intervention." 129 S.W.3d at 739. The evidence concerning the parent's substance abuse reflected "more than just 'remote and isolated incidents.'" *Id.* at 741. Despite the parent's testimony that he had stopped abusing narcotics and alcohol, the jury was not required to ignore the parent's long history of dependency and destructive behavior. *Id.* Instead, the jury was entitled to infer, based on this evidence and evidence that the parent failed to appreciate the need for treatment, that the parent's substance abuse and mental health issues would continue and would further jeopardize the child's well being. *Id.* In this case, Leacroy testified that, before removing the children and filing its original petition, DFPS attempted to get Toliver substance abuse treatment based on "several reports" that Toliver was "snorting cocaine" and using other narcotics. Toliver initially denied narcotics use and said that she did not need those services. Counselors had made home-based

visits to conduct random urinalysis on Toliver on two separate occasions, and Toliver refused those tests for fear of providing "a positive sample." On another visit, the counselor was told that Toliver continued "to use mood altering chemicals." When Toliver finally submitted to testing in August 2004, she tested positive for cocaine on four separate occasions.

After DFPS was named managing conservator of the children in September 2004, Toliver signed a mediated settlement agreement, which required her to follow all recommendations, including those made as a result of a narcotics evaluation. The agreement also contained an order that Toliver take a urinalysis "today" and that Toliver was required to "go inpatient" if her tests were positive. The agreement, which included admonishments about noncompliance, informed Toliver that her parental rights were in jeopardy.

DFPS also introduced into evidence numerous status hearing orders and permanency plans. These reflected that, as early as October 2004, Toliver was ordered to take urinalysis testing and to "go inpatient" if she tested positive. Toliver was initially admitted to inpatient treatment at the ADA in November 2004. However, Toliver was quickly discharged seven days later because she threatened other clients and staff members and exhibited hostile behaviors. ADA's records reflected that Toliver had no intention to complete the treatment objectives, but was there only because of DFPS.

The February 11, 2005 permanency plan and permanency progress report reflected that Toliver told DFPS that she was "too busy" to visit her children. Because of Toliver's hostility toward the children's relative care giver, DFPS required Toliver to schedule any future visits at DFPS's office. On February 17, 2005, the trial court again ordered Toliver to take a urinalysis. The May 12, 2005 permanency plan stated that after Toliver was discharged from inpatient treatment at ADA due to her behavioral problems, DFPS located another inpatient program, but Toliver refused to go. Instead, Toliver began outpatient treatment at GCC, but based on positive test results for cocaine, she was discharged, again with a recommendation that she go to inpatient treatment. Again, Toliver failed to go to inpatient treatment. The report further noted that on March 25, 2005, when Toliver met with her children, she was "extremely anxious and agitated as well as highly emotional," that she appeared to be "high," and that she was warned to calm down or her visit would be terminated. Toliver tested positive for cocaine five days later. This appears to be either the last or one of the last visits Toliver had with her children. Finally, the report stated that it was unlikely that Toliver would make significant changes and that Toliver had been aggressive with a counselor during at least one session, so much so that the counselor feared that Toliver would become "violent." The report concluded that there was no progress because Toliver continued to use narcotics and that Toliver was unable to maintain a safe and stable home for her children.

The May 27, 2005 permanency hearing order reiterated that Toliver had not demonstrated adequate compliance with the service plan, and the trial court, yet again, ordered Toliver "to go inpatient." The trial court expressly stated that if Toliver did "not successfully complete rehab," her case would "go to termination." Although Toliver did complete inpatient treatment, shortly thereafter, on August 8 and 11, 2005, Toliver again tested positive for cocaine and PCP and reported daily use of alcohol. Toliver subsequently "became hostile," was "unwilling to work on her accountability," and "was unable to com-

plete" the program because she "became combative, threatening and cruel" and "present[ed] a threat to group safety."

Finally, at a "crisis team intervention," despite GCC's and DFPS's attempts to explore "other options for treatment," Toliver stated that "she would not return to residential treatment" and did not want GCC services. Although DFPS informed Toliver that she was not given permission to leave treatment, Toliver stated that she was moving to Houston that night. GCC discharged Toliver, noting that she refused "to own [up to her] use of PCP and appeared irritated and indigent at being drug tested." Toliver never contacted Brewster again.

This evidence supports a finding that Toliver engaged in substantial and long term narcotics abuse, both before and after DFPS became involved in the case and was named managing conservator. Evidence of Toliver's narcotics use is even more significant when considered with evidence that D.H. is fragile, needs constant supervision, and has highly specialized medical needs, as well as evidence that Z.M. has rages and outbursts, presents behavioral problems, and poses a threat to D.H.'s safety if not properly supervised by her care takers. Additionally, Toliver continued her use of narcotics even after knowing that her parental relationship with her children was in jeopardy. *See Robinson,* 89 S.W.3d at 687 (stating that "appellant knew her parental rights were in jeopardy when she continued her illegal drug use" and finding fact that appellant testified that her drug problem ceased before trial "did not controvert evidence that appellant's illegal drug activity has been going on for 20 years"); *In re J.N.R.,* 982 S.W.2d 137, 142 (Tex.App.-Houston [1st Dist.] 1998, no pet.) (considering conduct jeopardizing parental rights as part of course of conduct endangering well-being

of child). The record is clear that from September 2003 to February 2006, DFPS and the trial court sought to get Toliver substance-abuse treatment, Toliver made little effort to complete treatment, and her treatment was ultimately unsuccessful.

Toliver's assertion that there is no evidence that she abused narcotics around her children is contradicted in the record. Toliver testified that she was the children's primary care giver. It also appears that the children's fathers, who were not married to Toliver and who were incarcerated for significant periods of time during the lives of the children and the pendency of the case, never provided supervision for the children in any meaningful way. Moreover, notes contained in a progress report, which were introduced into evidence, reflect that Toliver appeared "high" during one of her supervised visits with her children and that she had to be warned to stop her improper behavior or her visit would end. Toliver tested positive for narcotics shortly after this visit. Based on the specific facts presented in this case, we conclude that a fact finder could reasonably have formed a firm conviction or belief that Toliver, through her continued use of narcotics, engaged in conduct which endangered the physical and emotional well-being of her children. Accordingly, we hold that the evidence is legally sufficient to support the trial court's finding under section 161.001(1)(E).

In regard to the factual sufficiency review, Toliver testified that she went to inpatient treatment for thirty days and that the last time she used narcotics was when she left treatment in Galveston. However, after completing her inpatient treatment, Toliver almost immediately tested positive for narcotics, was discharged from her outpatient treatment for severe behavioral problems, and then refused other treatment options. At her

crisis intervention meeting, Toliver notified DFPS that she was moving to Houston and disregarded DFPS's instructions that she could not leave treatment and would need to seek treatment in Houston. After moving, Toliver did not seek substance abuse treatment, did not receive another narcotics test, and did not contact DFPS. Additionally, even Toliver testified that she still needed time to get herself together and to "make sure she [could] stay clean." In fact, Toliver did not even request that the children be placed back in her home. Considering both evidence supporting and contradicting the trial court's findings, we conclude that a fact finder could reasonably have formed a firm conviction or belief that there was sufficient evidence that Toliver engaged in conduct which endangered the physical and emotional well-being of her children. We hold that the evidence is factually sufficient to support the trial court's finding under section 161.001(1)(E).

We overrule Toliver's first issue. Having held that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(E), we need not address Toliver's second, third, fourth, and fifth issues, in which she contends that the evidence is legally and factually insufficient to support the trial court's findings under sections 161.001(1)(F), (N), and (O).

*Best Interest*

■■■■■ In determining whether termination was in the children's best interest, we may consider several factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) the stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is not proper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976); *In re L.M.,* 104 S.W.3d 642, 647 (Tex.App.-Houston [1st Dist.] 2003, no pet.). The burden is on DFPS to rebut the presumption that the best interest of the child is served by keeping custody in the natural parents. *In re K.C.M.,* 4 S.W.3d 392, 395 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). The *Holley* factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *See In re C.H.,* 89 S.W.3d at 27.

Although the trial court spoke with D.H., there is no evidence in the record concerning any of the children's desires. However, ample testimony was presented concerning D.H.'s and Z.M's special needs. The evidence also shows that D.H. was receiving specialized medical care that he had not received with Toliver. Furthermore, the foster family intended to adopt both D.H. and A.R., and the foster family was also willing to keep Z.M. in their home as a foster child to see if they could meet Z.M.'s needs while providing a safe environment for D.H. At trial, the foster family was still considering adopting Z.M.

In contrast, Toliver indicated that she was not in a position for the children to be returned to her. In fact, Toliver had not seen her children since Easter 2005 and had not been in contact with DFPS since being discharged from GCC and moving to Houston. Toliver also had not been tested for narcotics since leaving treatment and had not sought any treatment in Houston, despite DFPS's instructions that she was required to do so. Although Joseph, D.H.'s grandmother, stated that it would

be "a wonderful idea" for her to take all three children, she did not provide any details as to how she planned on providing for all three children. She also did not have any detailed plans on how she would transport D.H. to TCH to receive his treatments.

In addition to the above evidence, the trial court also could have considered the evidence supporting its finding that Toliver's frequent and long-term use of narcotics endangered the children's welfare. Toliver was repeatedly ordered by the trial court to "go inpatient," but refused to do so, even with the knowledge that her parental rights were in jeopardy. After Toliver finally completed an inpatient treatment program, she tested positive for cocaine almost immediately during her follow-up treatment. She was discharged from group treatment after exhibiting severe behavioral problems, and then left treatment altogether. Toliver never successfully completed a rehabilitation program to address her long term narcotics abuse.

From these facts, a fact finder could have formed a firm conviction or belief that termination of Toliver's parental rights was in the children's best interest. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Toliver's parental rights was in the children's best interest.

We overrule Toliver's sixth issue.

### Termination of Holloway's Parental Rights

In his first issue, Holloway contends only that the evidence is legally and factu-

ally insufficient to support the trial court's finding that "he knowingly placed or knowingly allowed [D.H.] to remain in conditions or surroundings which endangered the physical or emotional well-being of [D.H.]." *See* TEX. FAM.CODE ANN. § 161.001(1)(D). In his third issue, Holloway contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship between him and D.H. was in D.H.'s best interest. *See* TEX. FAM.CODE ANN. § 161.001(2).

*Findings under section 161.001(1)*

▄▄▄▄▄ As noted above, in proceedings to terminate the parent-child relationship brought under Texas Family Code section 161.001, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under subsection (1) of section 161.001 and that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001; *Boyd,* 727 S.W.2d at 533. Only one predicate finding under section 161.001(1) is necessary to support termination. *In re A.V.,* 113 S.W.3d 355, 362 (Tex.2003).

Here, the trial court, in its order terminating Holloway's parental rights, found that Holloway violated section 161.001(1)(D). TEX. FAM.CODE ANN. § 161.001(1)(D). However, the trial court also found that Holloway had violated subsections (F), (N), and (O) of section 161.001(1). Holloway does not challenge the sufficiency of the evidence supporting the findings under section 161.001(1)(F), (N), and (O), and thus he waives any complaint about the sufficiency of the evidence to support these findings.[21] Because only

---

21. In his second issue, Holloway contends that the evidence is legally and factually insufficient to support the trial court's finding under section 161.001(1)(M). However, we note that the trial court did not make such a finding in its written termination order, and in-

stead cited sections 161.001(1)(D), (F), (N), and (O). DFPS agrees that there is no evidence to support a finding under section 161.001(1)(M), and asserts that its inclusion in the transcript was likely error.

one predicate finding under section 161.001(1) is necessary to support termination, we need not address Holloway's first issue, which solely relates to the trial court's finding under section 161.001(1)(D).

*Best interest*

■ In regard to the best interest finding, Holloway asserts that his mother, Joseph, had requested that all three children be placed in her home, which would allow all three children to stay together. Holloway also notes that he received specialized training to care for D.H. and that he had made "at least three affirmative actions" to remove D.H. from Toliver's care.

Again, in determining whether termination of Holloway's parental rights was in D.H.'s best interest, we consider a number of factors, including the child's desires, the current and future physical and emotional needs of the child, the current and future physical danger to the child, the parental abilities of the person seeking custody, whether programs are available to assist the person seeking custody in promoting the best interests of the child, plans for the child by the person seeking custody, the stability of the home, acts or omissions of the parent that may indicate that the parent-child relationship is not proper, and any excuse for acts or omissions of the parent. *Holley*, 544 S.W.2d at 371–72. The burden is on DFPS to rebut the presumption that the best interest of the child is served by keeping custody in the natural parents. *In re K.C.M.*, 4 S.W.3d at 395.

In regard to the *Holley* factors, Faught, D.H.'s foster mother, testified that she and her husband intended to adopt both D.H. and A.R. and that her family was still considering adopting Z.M. Faught stated that they were willing to keep Z.M. in their home as a foster child to see if they could meet Z.M.'s needs while providing a safe environment for D.H. D.H.'s foster family provided him with proper medical care, and D.H. was receiving specialized medical care for his brittle bone condition, something he had not been receiving beforehand. Faught testified that she had numerous people, many who were therapists, in her household during the day to help care for her foster children. Faught stated that she and her husband had bonded with D.H. and that her husband and D.H. were "very close." She also stated that D.H. was involved in a special baseball league.

In contrast, although Holloway's mother indicated that it would be "a wonderful idea" for her to care for D.H. and D.H.'s siblings, she did not provide any details as to how she planned on providing for all three children. Joseph lived in a one-bedroom apartment with assistance from the county, though she thought she could get a bigger apartment with additional county assistance. Joseph, who admitted that she was currently unable to work because of an injury, appeared to agree that she would need help in caring for the children. However, both of Joseph's daughters had a history with DFPS, and would not be helping her. Joseph did not provide detailed testimony on who else would help her. Additionally, Holloway, who testified that he had received training to care for D.H., was incarcerated. Joseph's testimony left doubt as to whether she and her family would be able to care for the children and whether they would be able to transport D.H. to TCH to receive the bone fusion treatment that he was currently receiving with his foster family. Holloway's and Joseph's testimony also indicates that they had not given any thought to major safety issues identified by the foster family, i.e., the impact of Z.M.'s behavioral problems on D.H.'s physical safety. A fact finder could reasonably have concluded that had D.H.

been placed with Joseph, he would have again ended up "bouncing" between various family members for the rest of his life, would not have received proper care, and would have been in an unsafe environment.

We recognize that Holloway stated that he loves his son very much, and that he had signed papers giving permanent managing conservatorship to his mother because he would "rather put him with a family member" so that the children could stay together. Holloway also said that Joseph had been fair to him growing up and, in response to DFPS noting that both of Joseph's daughters had their children taken away by DFPS and that Holloway was incarcerated, Holloway stated that none of that was her fault.

However, from these facts, we conclude that a fact finder could reasonably have formed a firm conviction or belief that termination of Holloway's parental rights was in D.H.'s best interest. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of Holloway's parental rights was in D.H.'s best interest.

We overrule Holloway's third issue.

### Termination of Martin's Parental Rights

▪ In his second issue, Martin argues that the trial court erred in terminating his parental rights to Z.M. on the basis that he did not timely file an admission of paternity after being served because he appeared at trial, asserted his paternity, and requested that his parental rights not be terminated. *See* TEX. FAM.CODE ANN. § 161.002(b)(1). He asserts that DFPS should have been required to seek termination on other grounds in section 161.001(1). DFPS responds that Martin's testimony was not timely and that Martin was required to file "some kind of docu-

ment" to admit his paternity in accordance with the statute.

▪ Section 161.002 provides:

The rights of an alleged father may be terminated if:

(1) after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity under Chapter 160.

*Id.* Subsection (b)(1) allows a trial court to "summarily terminate" the rights of an alleged biological father who does not assert his paternity by filing an admission of paternity or a counterclaim for paternity. *Id.; see Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 357 (Tex.App.-Austin 2000, no pet.). However, by filing an admission or counterclaim for paternity, the alleged father is given the right to require the State to prove by clear and convincing evidence that he engaged in one of the types of conduct listed in section 161.001(1) and that termination is in the best interest of the child. *Phillips*, 25 S.W.3d at 357.

Here, the trial court terminated "any parental relationship" between Martin and Z.M. "that may exist" based on findings that Martin, after being served with citation, did not respond by timely filing an admission of paternity or a counterclaim of paternity. *See* TEX. FAM.CODE ANN. § 161.002(b)(1). Martin never formally filed a document with the trial court admitting his paternity. Martin also did not appear for mediation, and the settlement agreement stated that he was "never adjudicated the legal father." However, Martin appeared at trial and stated that he was Z.M's father. Martin further stated that he had been involved with Z.M. for most of her life and that he loved her. Martin had not previously contacted DFPS because he "didn't know any contact num-

bers" and did not know he had the right to contact Z.M.

Our sister courts have addressed somewhat similar issues. For example, In *In re K.W.*, the Texas Department of Protective and Regulatory Services ("TDPRS") served a petition seeking termination of parental rights on a father who was incarcerated. 138 S.W.3d 420, 429 (Tex.App.-Fort Worth 2004, pet. denied). The following month, the father wrote letters to TDPRS and the court stating that he was the child's biological father and that he was not giving up his parental rights. *Id.* The court held that the father's letters constituted "admissions of paternity sufficient to put TDPRS and the trial court on notice that [the father] admitted his paternity and wanted to oppose termination of any rights he might have with respect to [the child]" and thus there was no evidence to support the trial court's finding under section 161.002(b)(1). *Id.* at 431.

Similarly, in *Estes v. Dallas County Child Welfare Unit of Texas Department of Human Services*, which was decided under a former but substantively similar statute, the State filed a petition to terminate the parental rights of a father who was in prison. 773 S.W.2d 800, 801 (Tex. App.-Dallas 1989, writ denied). Two weeks before the final termination hearing, the father filed a pro se answer, alleging that he was an indigent parent and requesting the appointment of an attorney. *Id.* The court stated that "[t]here is no provision in the Texas Family Code that specifies any particular form or language required for an admission of paternity." *Id.* The court noted that "the natural rights existing between a parent and child are of constitutional dimensions" and that "involuntary termination proceedings must be strictly scrutinized." *Id.* at 802 (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). The court, applying strict scrutiny,

stated that the father's answer constituted an admission of paternity and that the answer "was timely filed since it was filed prior to the final hearing in the suit for termination." *Id.; see also In re D.D.S.*, No. 2–05–00313–CV, 2006 WL 2309813, at *2 (Tex.App.-Fort Worth Aug. 10, 2006, no pet.) ("This court has held that there are no formalities that must be observed for an admission of paternity to be effective; for example, an admission of paternity in letters written to the trial court will suffice.").

Section 161.002 prescribes the filing of an admission of paternity, but there is no reference in the statute to any formalities that must be observed when "filing" such an admission. Here, although Martin did not file a document with the court clerk, he appeared at trial prior to the trial court's termination of his parental rights, unequivocally asserted that he was Z.M.'s father, and requested that his parental rights not be terminated. Applying strict scrutiny to this termination statute, as we are required to do, we hold that Martin, by appearing at trial before his rights were terminated and admitting that he was in fact Z.M.'s father, triggered his right to require DFPS to prove that he engaged in one of the types of conduct listed in section 161.001(1) before his parental rights could be terminated. Accordingly, we further hold that the trial court erred in finding that Martin did not timely file an admission of paternity and in terminating his parental rights to Z.M.

We sustain Martin's second issue. Having sustained Martin's second issue, we need not address his first issue in which he contends that the evidence is legally and factually insufficient to support the trial court's findings that termination of the parent-child relationship between Martin and Z.M. was in Z.M.'s best interest.

## Conclusion

We affirm that portion of the order terminating the parental rights of Toliver in regard to D.H., Z.M., and A.R. We also affirm that portion of the order terminating the parental rights of Holloway in regard to D.H. However, we reverse that portion of the order terminating the parental rights of Martin in regard to Z.M., and remand the cause to the trial court for proceedings consistent with this opinion.