

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00472-CV

In the Interest of **J.V.** Jr., A.A.V., N.V., S.L.V., M.A.T., E.J.V., J.F.V., Children

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-00998
Honorable Richard Garcia, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
    Patricia O. Alvarez, Justice
    Jason Pulliam, Justice

Delivered and Filed:  December 9, 2015

AFFIRMED

B.T.,[1] who is the mother of the children the subject of this suit, appeals from the trial court's final judgment terminating her parental rights.[2] In a single issue, B.T. challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights was in the children's best interest. We affirm.

### THE TRIAL EVIDENCE

This case proceeded to trial before the court on April 16, 2015. Three witnesses testified at trial, a caseworker for the Department of Family and Protective Services, B.T.'s brother, and B.T.

---

[1]To protect the identity of the children, we refer to appellant by her initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8(b)(2).

[2]The trial court also terminated the parental rights of the children's father but he did not appeal.

*Caseworker's Testimony*

A Department caseworker, Latoya Loftin, testified that this case began when the Department received a referral for neglectful supervision and drug abuse, namely cocaine and prescription drugs, by the children's parents. After investigating the allegations, the Department obtained temporary custody of the children and the children were removed from their parents' home in May 2014. Subsequently, Loftin developed a service plan for B.T., which included an inpatient drug treatment program, parenting classes, and individual and family counseling. It also required B.T. to obtain steady housing and employment. Loftin met with B.T. several times. During these meetings, Loftin reviewed the service plan with B.T. and called various service providers to set up appointments for B.T. One of the appointments was an appointment for B.T. to begin drug treatment. Loftin kept in constant contact with B.T. to make sure that B.T. had the services she needed. To Loftin's knowledge, B.T. never completed inpatient drug treatment or the parenting classes, and she did not actively engage in counseling. In 2014, B.T. had visits with the children in May, June, and July and on Thanksgiving. B.T. once bought shoes, clothes, and movies for the children, and gave them these items during a visit.

B.T., the children's father, and the Department participated in mediation. In accordance with an agreement reached in mediation, the Department was making its best effort have the six oldest children adopted by relatives on their father's side of the family. A home study of the relatives had been completed and the children had been able to visit with these relatives at a park. The children had a good time during the visit and wanted to go back. As to the youngest child, J.F.V., the Department's plan was for her to remain in her current placement with a foster family. J.F.V. had formed a bond with the foster family, and the foster parents were willing to continue J.F.V.'s relationship with her siblings.

According to Loftin, the children had some problems. One of the younger children, E.J.V., was eighteen months old and not talking; he was able to make only a few sounds. M.A.V. needed speech and occupational therapy, and was also scheduled to see a developmental doctor. The oldest four children were having problems in school, and were being tested for dyslexia and other learning disabilities. However, A.A.V. was doing a little better in school than J.V., N.V., and S.L.V.

In Loftin's opinion, B.T. had not shown that she could provide a safe and stable environment for her children. Furthermore, B.T. had not shown that she had obtained stable employment. The purpose of the service plan was to help B.T. address the issues that had led to the removal of her children, but Loftin was not confident that B.T. had yet addressed those issues. Loftin believed that B.T. had started parenting classes; however, Loftin was unable to find out how many classes B.T. had attended because B.T. had revoked her permission to release that information to Loftin.

According to Loftin, the Department held two family group conferences about this case, and B.T. was present at both. At the first conference, B.T. expressed her desire to work with the Department. In all, B.T. had seven supervised visits with the children, Loftin observed the visits, and they all went well. B.T. also had one visitation supervised by relatives on Thanksgiving. The children appeared to be attached to their mother. Loftin felt that it would be in the children's best interest for B.T. to remain a part of their lives, but only if B.T. was clean and sober.

Loftin acknowledged that B.T. had experienced medical problems while the case was pending. B.T. was pregnant when the case began, and later, after giving birth to J.F.V., B.T. suffered from an infection and was hospitalized. B.T. was under a doctor's care for part of the time the case was pending, but not for the whole time. After B.T.'s medical condition improved, B.T. did not call Loftin and say that she wanted to become actively engaged in the case. Loftin's phone

number never changed during the pendency of this case. Loftin believed that B.T. had made the decision not to complete her service plan.

Loftin further testified that B.T. expressed numerous concerns about the six oldest children's initial placement. B.T. told Loftin that the children smelled like smoke and urine. B.T.'s concerns were indicative of a caring parent, one who was concerned about the welfare of her children. Thereafter, B.T. filed a motion to have the children placed with family members and, eventually, the children were placed with family members. However, after the children were placed with family members, B.T. disappeared and the Department did not hear from her.

According to Loftin, the Department's main concern with returning the children to B.T. was her drug use. B.T. tested positive for drugs twice during the pendency of this case. B.T. had tested positive for opiates about six weeks before trial. Prior to taking the last drug test, B.T. told Loftin she was not on any medications. Based on the conversations she had with B.T., Loftin felt that B.T. cared about her children. B.T. loved her children and the children loved her. However, Loftin said the children needed a stable home environment and someone to make sure that their educational, medical, and daily needs were being met. B.T.'s family, including her brother, had shown that they were a support system for B.T. However, according to Loftin, B.T. was not able meet the children's needs at this time.

### I.T.'s Testimony

B.T.'s brother, I.T., also testified. According to I.T.'s testimony, the six oldest children were placed in his home during this case. I.T. had a close relationship with the children, and was aware of the problems they had. B.T. was in contact with I.T. while the children were placed with him, and B.T. texted I.T. on the children's birthdays. I.T. felt that B.T. loved her children and wanted what was best for them. Although I.T. had not seen B.T. use drugs, he believed B.T. had a drug problem. Nevertheless, I.T. felt that it would be in the children's best interest for B.T. to

retain some rights to the children and to be part of the children's lives. I.T. did not think the children should be with B.T. right now, but at some time in the future.

### B.T.'s Testimony

B.T. testified that she started taking opiates without a prescription in 2014. B.T. also stated that she was not using drugs, she was simply taking a pill. B.T. claimed the children were removed from her care because she "came out dirty;" it had nothing to do with the care she provided her children or the condition of her house. B.T. asserted that her children were always "dressed, fed, and clean" when she was caring for them.

According to B.T., she had been the children's primary caregiver. The children's father was presently incarcerated, and had been incarcerated for the past nine or ten months. After the children's removal, B.T. attended thirteen parenting classes, but she stopped going to parenting classes in August 2014, when she gave birth to her youngest child. B.T. admitted that she did not participate in any other services on her service plan.

B.T. explained that her medical condition affected her ability to be involved in this case between August 2014 and December 2014. B.T. was hospitalized for a couple of weeks and, after that, was still healing. B.T. was finally released from a doctor's care in December 2014.

B.T. said that after the children were placed with her brother, she would "sometimes" stay in contact with him. B.T. did not want to do anything that would jeopardize the children's placement with her brother; she felt that it would be in the children's best interest for them to remain with him. B.T. did not visit the children at her brother's home without the Department's approval. B.T. would text her brother on the children's birthdays, and asked him to tell the children that she wished them a happy birthday. B.T. said that she had a close relationship with all of her children.

According to B.T., she was employed "on and off" while this case was pending. The longest time she held a job was about a month. B.T. also said she had been incarcerated for theft of clothing. B.T. admitted she did not have a stable home. For this reason, B.T. did not feel that placing the children with her was in their best interest right now. B.T. said that being incarcerated opened her eyes about her children, and made her realize that she should have looked at her case differently. B.T. asked the court to allow her to maintain some kind of possessory rights so she could still have court-ordered visitation with her children. B.T. felt such an arrangement would be in the children's best interest.

B.T. acknowledged that she failed to do what she was supposed to do; she took hydrocodone, became addicted, and could not stop. B.T. further explained that she tried to motivate herself to do better, but could not because the Department put pressure on her. B.T. admitted that she tested positive for drugs in March 2015.

B.T. testified that she did make some efforts at drug rehabilitation, but her efforts fell short. B.T. had contacted a drug rehabilitation program, but the program would not take her because she was "dirty" at the time. And, more recently, after being released from incarceration, B.T. felt she had taken some measures to address her drug problems because she was no longer hanging around the same people. B.T. nevertheless agreed that it was not fair that her children's lives were on hold.

Finally, B.T. testified that she did not expect the children to be placed with her, but she did want the children to be placed with family members. B.T. stated that the reason she did not agree to relinquish her parental rights was because the Department could not guarantee that the children were going to be placed with family members. B.T. wanted her rights preserved so that she could be part of the children's lives in the future.

**STANDARDS OF REVIEW**

In reviewing the legal sufficiency of the evidence in a parental termination case, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a strong belief or conviction that its finding was true. *In the Interest of J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. If we conclude that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude the evidence is legally insufficient. *Id*.

In a factual sufficiency review, we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. We must consider whether disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

**DISCUSSION**

Termination of parental rights under section 161.001 of the Texas Family Code requires proof by clear and convincing evidence that the parent committed one of the acts or omissions listed in section 161.001(1)(A)-(T), and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1),(2) (West 2014). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2014).

Here, the trial court found that B.T. (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children [§ 161.001(1)(E)]; (2) constructively abandoned the children

[§ 161.001(1)(N)]; (3) failed to comply with a court order that established the actions necessary for her to obtain the return of the children [§ 161.001(1)(O)]; and (4) used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program [§ 161.001(1)(P)]. B.T. does not challenge the sufficiency of the evidence to support these findings. B.T. only challenges the sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest.

There is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *In the Interest of R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, there is also a presumption that the prompt and permanent placement of the child in a safe environment is in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2014). Stability and permanence are paramount in the upbringing of children. *In the Interest of D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.); *In the Interest of J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Children require secure, stable, long-term, continuous relationships with their parents or foster parents. *D.M.*, 452 S.W.3d at 472; *Castorena v. Tex. Dept. of Prot. & Regulatory Serv.*, No. 03-02-00653-CV, 2004 WL 903906, at *10 (Tex. App.—Austin 2004, no pet.).

The Texas Family Code lists factors courts should consider in determining whether parents are willing and able to provide the child with a safe environment. TEX. FAM. CODE ANN. § 263.307(b). The listed factors that are relevant to our analysis include the children's age and vulnerabilities; a history of substance abuse by the children's family; the willingness and ability of the children's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; and the willingness and ability of the children's family to effect positive environmental and personal changes within a reasonable period of time. *Id*. § 263.307 (b)(1),(8),(10),(11).

In addition, in evaluating the best interest of the child we may consider the factors articulated in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id*. In evaluating *Holley* factors, we focus on the best interest of the child, not the best interest of the parent. *Dupree v. Texas Dept. of Prot. and Regulatory Serv.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

In evaluating the best interest of the child, we may consider direct and circumstantial evidence, subjective factors, and the totality of the evidence. *In the Interest of E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The same evidence proving acts or omissions under section 161.001(1) of the Texas Family Code may be probative of the children's best interest. *In the Interest of C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). There is no requirement that evidence be presented as to each of the *Holley* factors. *Id*. at 27.

We now consider the evidence in this case as it relates to the above-mentioned factors. There was no evidence presented as to the children's desires. However, the children, who ranged in age from six months to nine years, were quite young. There was evidence that some of the children had additional needs; two of the younger children were receiving speech therapy and the older children were having problems in school.

As to the children's emotional and physical needs, the emotional and physical danger to the children, and parental acts or omissions, B.T.'s abuse of cocaine and prescription drugs had

triggered the children's removal from B.T.'s care. B.T. tested positive for drugs twice during the pendency of this case. B.T. had tested positive for opiates as recently as six weeks before trial. B.T.'s service plan required her to complete inpatient drug treatment, but she failed to do so. Even by her own admission, B.T. had not made any real progress in resolving her drug problems. B.T. did not complete her services, and again, by her own admission, did not have a stable home for the children and was not prepared to parent her children full-time.

As to excuses for B.T.'s acts or omissions, B.T. was hospitalized for several weeks while this case was pending; however, even after B.T.'s medical condition improved, she failed to become actively engaged in the case. After B.T. was released from a doctor's care in December 2014, B.T. did not contact the Department to resume visits with her children; B.T. essentially abandoned the children. B.T.'s failure to participate in visits after her medical condition improved was an omission that tended to show that her relationship with the children was not a proper one.

As to the stability of the children's placements and the Department's plans for the children, the youngest child, J.F.V., was living with a foster family. The Department's plan was for J.F.V. to remain in her current placement. J.F.V. had formed a bond with the family and the foster parents had expressed a willingness to continue the child's relationship with her siblings. The six oldest children were presently living with B.T.'s brother. The Department planned to place these children in the same home, and was making an effort to have all of the children adopted by relatives on their father's side of the family. The relatives had been identified and wanted all of the children to be placed with them. The relatives had participated in a successful visit with the children, and a home study had been completed.

A parent's drug-related conduct is a significant factor to which a factfinder can give great weight in evaluating the best interests of the child. *Dupree*, 907 S.W.2d at 86. A factfinder can form a firm conviction or belief that termination of parental rights is in a child's best interest from

facts showing a parent's frequent and long-term use of drugs. *Toliver v. Texas Dept. of Family and Prot. Serv.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Here, the undisputed evidence showed that B.T.'s abuse of cocaine and prescription drugs caused the Department to initiate this case. B.T. tested positive for drugs twice while the case was pending. In fact, B.T. had tested positive for opiates as recently as six weeks before trial. B.T.'s service plan required her to complete inpatient drug treatment, but she failed to do so. These facts all supported the conclusion that B.T. was engaged in frequent and long-term use of drugs.

Additionally, there is a presumption that the prompt and permanent placement of the children in a safe environment is in the children's best interest. TEX. FAM. CODE ANN. § 263.307(a). The need for permanence is the paramount consideration for a child's present and future physical and emotional needs. *Dupree*, 907 S.W.2d at 87. In this case, the undisputed evidence showed that B.T. could not provide the children with a safe, stable environment. B.T. was unwilling to seek out, accept, and complete counseling services, and to cooperate with and facilitate the Department's close supervision. For example, B.T. revoked her permission to release information to the Department concerning her participation in parenting classes. Furthermore, B.T. was unwilling to effect positive environmental and personal changes within a reasonable period of time. B.T. did not even begin a drug treatment program much less complete one, despite the fact that at the beginning of the case a caseworker set up an appointment for B.T. to begin drug treatment. In addition, B.T. completed none of the services on her service plan. B.T.'s history of drug abuse, her unwillingness to complete services, her unwillingness to cooperate with an agency's close supervision, and her unwillingness to effectuate personal and environmental changes within a reasonable period of time, all supported the conclusion that B.T. was unable to provide the children with a safe environment. Furthermore, although neither B.T. nor her brother, I.T., believed that it was in the children's best interest for B.T.'s parental rights to be terminated,

both B.T. and I.T. admitted that B.T. was not in a position to provide the children with a stable home environment.

In arguing that the evidence was legally and factually insufficient to support the trial court's best interest finding, B.T. complains about the absence of evidence concerning some of the *Holley* factors. However, as previously stated, there is no requirement that evidence be presented as to each of the *Holley* factors. *C.H.*, 89 S.W.3d at 27. Additionally, B.T. points to evidence that she completed thirteen parenting classes, and that she did so despite having a serious medical problem. B.T. asserts that by engaging in these parenting classes she is now capable of meeting the children's physical and emotional needs. B.T. also emphasizes that her visits with the children went well. However, the record contains other evidence that undermines this argument. For example, three months after the children were removed, B.T. stopped visiting the children, essentially abandoning them. And, even after her medical condition improved, B.T. did not resume visits with her children or otherwise become actively engaged in this case.

In light of B.T.'s continued drug use, B.T.'s unwillingness to begin—much less complete—a drug treatment program, and B.T.'s inability to provide the children a safe and stable home environment, we are of the opinion that a reasonable factfinder could have formed a firm conviction or belief that termination of B.T.'s parental rights was in the children's best interest. Considering all of the relevant factors under the applicable standards, we conclude the evidence was legally and factually sufficient to support the trial court's finding that termination of B.T.'s parental rights was in the children's best interest.

## CONCLUSION

The trial court's judgment terminating B.T.'s parental rights is affirmed.

Karen Angelini, Justice