**Affirmed and Opinion Filed June 21, 2016**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-16-00232-CV**

## IN THE INTEREST OF T.W., A CHILD

**On Appeal from the 256th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-15-00889**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Myers
Opinion by Justice Francis

T.G.W. (Mother) and J.L.W. (Father) appeal the trial court's decree terminating their parental rights to their daughter, T.W. In separate briefs, Mother and Father challenge the legal and factual sufficiency of the evidence to support the decision to terminate their parental rights and to appoint the Texas Department of Family and Protective Services as permanent managing conservator. For reasons set out below, we affirm.

The trial court conducted a bench trial to determine whether appellants' parental rights should be terminated. Neither Mother nor Father appeared at trial. The evidence showed that in 2014, both were involved in a parental termination case regarding their four children, all of whom were in CPS custody.[1] The case, which was "proceeding towards termination," involved

---

[1] Father was the biological father to three of the children; all of the children were born to Mother.

allegations of domestic violence and substance abuse, and records showed appellants would not cooperate in the investigation.

While the case was pending, the Department learned Mother was pregnant. A baby girl, T.W., was born in September 2014. Over the next several months, Department caseworkers tried numerous times to contact the family by phone and visits but could not confirm where T.W. was living and whether she was safe. At one point, a caseworker saw Mother outside of the courthouse during a hearing involving her other children. Mother gave the worker an address the Department had previously confirmed was a P.O. Box mailing center. When the worker reached Father by telephone, he refused to divulge the family's address, come to CPS offices, or participate in any services offered.

Because of concerns for T.W.'s safety and the parents' lack of cooperation, in January 2015, the Department filed a "First Amended Petition for Investigation of Child Abuse or Neglect, for Order to Participate in Services, and for Release of Information and Records." Although the Department believed T.W. lived with Mother, Father, or both, they could not confirm T.W.'s residence or that it was safe. An affidavit was attached to the petition detailing the Department's efforts in attempting to locate appellants and T.W. over many months as well as appellants' prior CPS history, which included allegations that Father had been physically violent with Mother and the other children and that one child tested positive for marijuana at birth.

A hearing on the petition was scheduled for February 11. By this time, appellants' parental rights to their other children had been terminated. Stephon Frazier, the Department investigator assigned supervisor, testified he spoke with Mother the day before the hearing, explained why the Department believed the family was not being cooperative, and talked to her about being present in court to determine what further steps needed to be taken. Nonetheless,

Mother was at least two hours late to the hearing. Frazier said he also spoke to Father, who kept referring back to hearings regarding the other children and was reluctant to participate in services regarding T.W. Following the hearing, the trial court ordered appellants to make T.W. and her residence available to the Department for inspection. In addition, Mother and Father were ordered to undergo psychological and psychiatric evaluations through a CPS provider; submit to random urinalysis and hair strand drug testing within twenty-four hours of the Department's request; complete parenting classes; sign releases for information regarding the health and mental health records of Mother and child, Father's military records, and marriage/counseling; and undergo individual counseling on domestic violence and, with respect to Father, anger management. The order warned that failure to participate in the court-ordered services could result in T.W.'s removal under chapter 262. A review hearing was scheduled two weeks later.

After the OTP hearing, Mother took T.W. to the CPS's offices so that workers could look her over. Also, a caseworker inspected Mother's residence, noting that it was clean but was devoid of any furniture except a crib. Additionally, the Department provided addresses and phone numbers to appellants to start counseling.

On the day of the review hearing, the trial court reset the matter until March so that appellants could obtain legal counsel. But the court ordered appellants to start their services and ordered the Department to conduct a minimum of three unannounced visits to the residence where T.W. was available, including that of any childcare provider who had possession. Over the next two weeks, the caseworker tried on three different occasions to visit Mother's residence but no one answered so she left her contact information on the door. And although Mother gave the name of the child care provider, she but did not give an address.

When the parties returned to court in March, Frazier said appellants had begun or completed "close to none" of the court-ordered services, and the Department was concerned

about "ongoing domestic violence" and appellants' lack of cooperation. By that time, Frazier explained, appellants' rights had been terminated to their other four children because of domestic violence, Mother had been diagnosed as bipolar but was not taking her medications, and Father was "known to be a perpetrator of family violence," all of which could put T.W. in immediate danger. Although it was unclear whether Father was living in the home with Mother, the Department had concerns that Mother was "unable to be protective" because she allowed the child to be around Father. And despite its efforts, the Department had not been able to verify the whereabouts of the child or whether she was in a safe location. The Department asked to be named temporary managing conservator of T.W. with intent to place the child in foster care.

The trial court ordered the child removed from appellants' custody, but Mother refused to disclose T.W.'s whereabouts. It was only after the trial court ordered Mother taken into custody that she revealed the child's location. T.W. was placed in foster care that day. Appellants were given caregiver resource forms to identify relatives or close friends to care for T.W. Both listed Father as well as two relatives that lived in California.

The next day, the Department filed its original petition for protection of a child, for conservatorship and for termination in the suit affecting parent-child relationship. Following a hearing two weeks later, the trial court signed temporary orders naming the Department temporary managing conservator of T.W. and again set out the services appellants needed to complete. At trial, Frazier acknowledged there were no "new allegations" of domestic violence between appellants from the time T.W. was born until her removal in March.

Nikisha Anderson, a caseworker, created the service plans that reflected the court-ordered services appellants needed to complete for reunification to occur. According to Anderson, Father did not complete any of the services, did not ask for any visitation with T.W., or attend

–4–

any court hearings, except one, while she was assigned to the case. Anderson said Father told her he traveled in his job as a truck driver and would not be in town to do any services.

Anderson testified Mother also did not complete all the services ordered. Mother started some of the services and completed the psychological evaluation and two drug tests, both of which were negative. But she did not, for example, complete counseling. Shortly before the termination trial, the Department learned Mother had moved to Atlanta, Georgia. According to Anderson, Mother did not notify the Department of her move nor had she made arrangements for an alternative services location. In fact, at the time of trial, Mother had not had any visits with T.W. in at least three to four months. Anderson testified the Department did not have a current address for either parent and thus had no address to return T.W. if ordered.

Betty Cannon, a contract therapist with the Department, explained Mother was referred to her for counseling on domestic violence. Mother met with Cannon in fifteen sessions and consistently denied the existence of domestic violence, even when confronted with statements from persons outside of the Department and her own statement to the police.

Cannon said that in her sessions, Mother was not focused on T.W., but was focused on her frustrations with the Department and its opening of the new case involving T.W. Cannon said Mother provided inconsistent information about the status of her relationship with Father. On one hand, she would tell Cannon they were divorced or divorcing, primarily because Mother believed she could regain custody only if she separated from Father. On the other, Mother admitted her long-term goal was to regain custody of T.W. and reunite with Father.

Cannon last saw Mother in September 2015, and Mother told her she was going to the East Coast for job training. A week later, Mother called and said she was still out of town and might not be back until the following week. She next heard from Mother in November when Mother called, said she was living in Atlanta, Georgia, did not plan on returning to Dallas, and

wanted to do counseling by telephone. Cannon declined. Because Mother failed to complete her counseling, Cannon unsuccessfully discharged her. Cannon testified she had concerns about Mother's ability to parent T.W. independently as well as her ability to protect T.W. from domestic violence situations, given her "state of denial." Cannon explained that a parent cannot protect a child if she does not recognize the problem.

Myrna Dartson, a licensed psychologist, testified she assessed Mother's intellectual, emotional, academic, and personality functioning. Like Cannon, Dartson was concerned with the conflicting information regarding domestic violence. Mother told Dartson there was no domestic violence in her relationship with Father and that she had once falsely reported an incident to the police because she was angry. But a CPS affidavit, provided to Dartson, recounted Father's abuse of Mother. In one specific incident, Father kneed Mother in her abdomen, kicked her in the vaginal area, and pulled a knife on her in the presence of their children, all while Mother was pregnant.

Additionally, Dartson explained that in one of her tests, she had Mother draw a full-body picture of herself. Mother drew a picture with her hands behind her back, which Dartson said suggested Mother is "secretive" and "not willing to discuss an issue or discuss certain information." Dartson believed Mother was not forthcoming about domestic violence or drug abuse, both of which she said would prevent Mother from providing the best possible care to T.W. and would place her at "continued risk for neglect and/or abuse."

Finally, T.W.'s foster mother testified she has one biological child, two adopted children, and two in adoptive placement. T.W. was five months old when she was placed with her family and was sixteen months old at the time of trial. During those eleven months, Foster Mother said Father saw T.W. twice early on, and Mother had not seen her since September 2015, which was four months before trial. Foster Mother said T.W. was "very bonded" with her family and went

on vacations with them. T.W. went to daycare, had no medical needs, and was current on all of her shots. All of her needs were being met, including clothing and a home. Foster Mother said she and her husband can care for T.W. in the long term, including adoption if available.

Foster Mother recounted her first meeting with Mother. Foster Mother was at Target with her children when Mother suddenly approached her and asked to "see her baby." Foster Mother was "kind of taken aback" and agreed. Mother began hugging and kissing T.W. Foster Mother said the encounter was "awkward" and not "coincidental." Mother said she knew who Foster Mother was because she had previously observed her at church, although Mother did not attend the same church. A few days after the encounter at Target, Foster Mother saw Mother at T.W.'s birthday party. Mother acted as if they had never met and then asked Foster Mother not to tell the Department about the earlier encounter. Foster Mother said Mother was loving toward T.W. at the party and interacted appropriately.

At the conclusion of the evidence, the trial court found clear and convincing evidence that Mother and Father had committed multiple predicate grounds to warrant terminating their parental rights and that termination was in T.W.'s best interest. The court appointed the Department permanent managing conservator of T.W. Both appellants separately appealed.

Under the Texas Family Code, parental rights can be terminated only when there is clear and convincing evidence that the parent has committed an act prohibited by section 161.001(b)(1) and termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(1),(2) (West Supp. 2015). "Clear and convincing evidence" is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007 (West 2014).

In a legal sufficiency challenge, we credit evidence that supports the verdict if a reasonable factfinder could have done so and disregard contrary evidence unless reasonable

jurors could not have done so. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). However, we should not disregard undisputed facts that do not support the verdict to determine whether there is clear and convincing evidence. *Id.* Even evidence that does more than raise surmise or suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *Id.* If we determine that no reasonable factfinder could form a firm belief or conviction that the matter to be proven is true, then we must conclude the evidence is legally insufficient. *Id.*

In a factual sufficiency review, we must give due consideration to any evidence the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002) (citing *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002)). We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

We begin with appellants' challenges to the predicate grounds. In her first three issues, Mother argues the evidence is legally and factually insufficient to support the trial court's findings that she violated subsections (B), (M), and (O). Only one predicate finding under section 161.001(b) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We begin with subsection (O).

Section 161.001(b)(1)(O) provides for termination when a parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal

from the parent under Chapter 262 for the abuse and neglect of the child. TEX. FAM. CODE ANN. § 161.001(b)(1)(O) (West Supp. 2015).

Mother first argues there is no evidence that T.W.'s removal was due to abuse or neglect as required by the statute. She contends the evidence shows only that she was uncooperative with the Department. Further, she asserts that when the Department visited her home, there was a crib for the baby and Father was not living there.

To comply with subsection (O), the Department did not have to prove actual abuse or neglect of T.W.; rather, the terms "abuse or neglect" as used in the statute "necessarily includes the risks or threats of the environment in which the child is placed." *In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013). A parent's history with other children is a factor in considering the risks or threats of the environment. *In re K.N.D.*, 424 S.W.3d 8, 10 (Tex. 2014) (per curiam). As the supreme court said in *E.C.R.*, "Part of [the] calculus includes the harm suffered or the danger faced by other children under the parent's care." *Id*. (quoting *In re E.CR.*, 402 S.W.3d at 248).

The affidavit attached to the petition for investigation of child abuse or neglect as well as the later petition for protection, conservatorship, and termination stated the Department received a referral on August 28, 2014 for neglectful supervision. At that time, the Department did not know T.W. had not yet been born and began its investigation as required by statute. At the time of the referral, appellants were under investigation for their conduct regarding four other children, and that case was "proceeding towards termination." In that case, Father was accused of domestic violence against Mother and the children, and Mother was accused of substance abuse after the youngest child tested positive for marijuana at birth. Given these allegations, the Department was understandably concerned about the risks to a newborn baby. Ultimately, the Department learned T.W. was born in September. The affidavit detailed the Department's many efforts to try to contact appellants, over a period of months, so that they could ascertain that T.W.

was safe. Appellants, however, would not cooperate. Given the open CPS case involving the other children, the allegations involved, and appellants' refusal to cooperate with the Department in locating T.W. to ensure she was safe, we conclude the evidence was sufficient to show that T.W. was at "substantial risk" of abuse or neglect.

Mother next asserts the evidence is insufficient to show she failed to comply with the provisions of the court order that established the actions necessary to obtain T.W.'s return. She argues the evidence showed that she "work[ed] her services" and "kept in communication" with her counselor, even after she moved.

Under her service plan, Mother was required to complete counseling, which was directed at the issue of domestic violence. Mother counseled with Cannon until September 2015, when Mother left town and did not return. At that point, she had not completed the service. A few months later, she contacted Cannon about counseling by telephone, but Cannon declined. As a result of Mother's failing to complete the counseling, Cannon unsuccessfully discharged her. So while the evidence showed Mother completed some services, she did not comply with the counseling requirement. Viewing the evidence in the light most favorable to the finding, and viewing the record as a whole, we conclude a reasonable factfinder could have formed a firm conviction or belief that Mother failed to comply with her service plan. We overrule the third issue. Having concluded there is legally and factually sufficient evidence to support the evidence as to subsection (O), we need not address the other two grounds found by the trial court.

In his first issue, Father argues the evidence is legally and factually insufficient to support a finding under subsection (M), which allows termination of parental rights if the parent has had his rights terminated with respect to another child based on a finding under subsections (D) or

–10–

(E).  He argues the judgment in the prior case was on appeal at the time of trial and therefore was not "final."  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (West Supp. 2015).

We need not address Father's complaint because the record shows that in addition to subsection (M), the trial court also made findings that Father violated subsections (B), (C), and (O).  Father has not challenged the sufficiency of the evidence to support these grounds and has thus waived any complaint that the evidence is insufficient to support these findings.  *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 102–03 (Tex. App.—Houston [1st Dist.] 2006, no pet.).  Because only one predicate finding under section 161.001(b)(1) is necessary to support termination and each of the unchallenged findings is sufficient to justify termination, we need not address Father's first issue related solely to a finding under section 161.001(b)(1)(M).  *See id.*  We overrule his first issue.

In Mother's fourth issue and Father's second issue, they each challenge the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in T.W.'s best interest.

Before a trial court may order termination of parental rights, it must find by clear and convincing evidence that termination is in the child's best interest.  *See* TEX. FAM. CODE ANN. § 161.001(b)(2).  There is a presumption that the best interest of the child will be served by keeping the child with a parent.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).

In determining whether termination was in the child's best interest, we may consider several factors, including (1) the child's desires, (2) the emotional and physical needs of the child and the emotional and physical danger to the child now and in the future, (3) the parental abilities of the individuals seeking custody, (4) the plans for the child by those individuals and the stability of the home, (5) the plans for the child by the agency seeking custody and the stability of the proposed placement, and (6) the acts or omissions of the parent which may indicate the

–11–

existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omission of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). These factors are not exhaustive; some listed factors may not apply to some cases, while other factors not on the list may also be considered when appropriate. *In re C.H.*, 89 S.W.3d at 27. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *Id.* Conversely, scant evidence relevant to each *Holley* factor will not support such a finding. *Id.* The burden of proof is upon the party seeking termination of parental rights. *In re J.F.C.*, 96 S.W.3d at 265–66.

Beginning with the emotional and physical needs of the child and the emotional and physical danger to the child now and in the future, the evidence shows T.W. was born while her parents were under investigation in a separate case involving her four siblings. In that case, Father was alleged to have physically abused Mother and the children, and appellants' rights to those children were terminated during the pendency of this case. While there was no evidence of domestic abuse while T.W. was in the custody of appellants, the evidence suggested there was a substantial risk of reoccurrence. Both Cannon and Dartson testified they were concerned because Mother denied the existence of domestic violence in the home, even when confronted with reports by third parties and her own statement to the police. In fact, Mother admitted to Cannon that her plan was to regain custody of T.W. and reunite with Father. As Dartson testified, because of Mother's unwillingness to acknowledge domestic violence, she was likely to continue to make decisions that would place T.W. at risk.

As for the parental abilities of appellants, their plans for the child, and the stability of the home, the record shows Mother has not provided a stable home for T.W, established any kind of support system, or even maintained contact with T.W. When the Department was finally able to inspect her residence, it was devoid of all furniture except a crib. And although the evidence showed Mother was employed, there is no evidence that she ever provided any financial support for T.W.'s care. More importantly, she left the state during the middle of this case, stopped her counseling sessions, and stopped visiting with T.W.

As for Father, he had not seen T.W. since shortly after her removal. The trial court found, and he does not dispute, that he abandoned her without providing any of her financial support. His lack of determination or desire with respect to T.W. is evidenced by the fact that (1) he stopped visiting her in March 2015, (2) stopped attending any of the court hearings, and (3) did not complete even one of the court-ordered services necessary for her return. More importantly, his parental rights were terminated to his other children due to domestic violence.

As for the plans for the child by the agency seeking custody and the stability of the proposed placement, the record shows T.W. has been in the same foster home since she was five months old and was sixteen months old at trial. T.W. obviously is too young to express any desires, but the evidence showed she is "very bonded" with her foster family, is well cared for by them, and had not seen Mother in months and had not seen Father since shortly after her removal. Foster Mother testified she cares for all of T.W.'s needs, and she and her husband are willing to continue to do so in the long term, including adoption if it were an available option.

Finally, considering acts or omissions or excuses, appellants failed to cooperate with the Department from the beginning. They gave the Department erroneous addresses in an effort to hide T.W. and, in fact, Mother was taken into custody at one point when she refused to tell the Court the child's location. While T.W. was in foster care, Mother tracked down the foster family

–13–

and apparently spied on them at church before later approaching Foster Mother at a Target. Then, she asked Foster Mother not to disclose the encounter to the Department. And, we cannot ignore the fact that neither Mother nor Father appeared at trial.

Viewing this evidence in the light most favorable to the finding, and viewing the record as a whole, we conclude a reasonable fact finder could have formed a firm conviction or belief that termination of Mother's rights was in T.W.'s best interest. We overrule the fourth issue.

In Mother's fifth issue and Father's third issue, they challenge the legal and factual sufficiency of the evidence to support appointment of the Department as managing conservator. Both recognize such a challenge is relevant in the event this Court reverses the trial court's decision to terminate. We have previously addressed this exact challenge under similar circumstances. *See In re N.T.*, 474 S.W.3d 465, 481 (Tex. App.—Dallas 2015, no pet.). As in *N.T.,* we have overruled all challenges to the decision to terminate. For the same reasons expressed in *N.T.*, we conclude this issue is without merit. We overrule Mother's fifth issue and Father's third issue.

We affirm the trial court's decree of termination.


/Molly Francis/
MOLLY FRANCIS
JUSTICE


160232F.P05

–14–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF T.W., A CHILD,

No. 05-16-00232-CV

On Appeal from the 256th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-15-00889.
Opinion delivered by Justice Francis; Justices Lang-Miers and Myers participating.

In accordance with this Court's opinion of this date, the trial court's decree of termination is **AFFIRMED**.

It is **ORDERED** that all parties bear their own costs of this appeal.

Judgment entered June 21, 2016.