# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-19-00066-CV

---

### M. V., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 18-0015-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

M.V. appeals from the trial court's order terminating his parent-child relationship with his children J.V. and S.V.[1]  After a bench trial, the trial court found that M.V. had committed conduct that satisfied the requirements for termination of parental rights found in paragraphs (D), (E), and (O) of Texas Family Code section 161.001(b)(1).  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O).  In addition, the trial court found that termination of M.V.'s parental rights was in the best interest of the children.  *See id.* § 161.001(b)(2).  For the reasons set forth below, we will affirm the trial court's judgment.

## BACKGROUND

On February 5, 2018, the Department of Family and Protective Services (the Department) received allegations that the porch of the children's home appeared to be

---

[1]  We use initials to protect the privacy of those involved in this case.  *See* Tex. Fam. Code § 109.002(d).

surrounded by blankets and it appeared to be used for sleeping. The next day, a Department investigator spoke to the principal of the school attended by the older children—I.G.,[2] then eight years old, and J.V., then six years old. The principal reported that she was concerned because the boys had missed several days of school and were often tardy. During its investigation, the Department found that the porch contained alcohol bottles and had the odor of marihuana. I.G. and J.V. made outcries of daily marihuana use by C.S. and C.S.'s sister during which time the boys and their eight-month-old sister, S.V., were left unattended inside. Both boys referred to "weed," and I.G. described his mother and aunt using a striped bong, which he described and drew a picture of. J.V. described where his mother kept the marihuana and described how to use a pipe to smoke it. Both boys stated that their father, M.V., smoked cigarettes but did not smoke marihuana. The Department removed the children from C.S. and M.V.'s care and, at the time of trial, the children were in foster care.[3]

C.S. has a history of involvement with the Department resulting in the termination of her parental rights to her then ten-month-old child in 2008. At the time of trial, M.V. was being detained by United States Immigration and Customs Enforcement (ICE) at a facility in Pearsall, Texas.[4] At trial, C.S. testified that she had not completed her service plan and that she believed termination of her parental rights was in the children's best interest. After a bench trial, the trial court issued an order terminating each parent's parental rights and awarding the Department sole managing conservatorship. The trial court terminated M.V.'s parental rights on three grounds—section 161.001(b)(1)(D), (E), and (O) of the Texas Family Code—in addition to

[2] I.G., J.V., and S.V. have the same mother, C.S., but M.V. is not I.G.'s biological father.
[3] I.G. and J.V. were placed in foster care together and S.V. was placed with a separate foster family.
[4] M.V. was placed in ICE custody in June 2018 following an altercation to which police were called.

2

finding that termination was in the children's best interest. *See id.* § 161.001(b)(1)(D), (E), (O), (b)(2). M.V. timely appealed.

## DISCUSSION

In his first issue, M.V. contends that there was legally insufficient evidence to support the termination of his parental rights pursuant to paragraph (O). However, M.V. does not challenge the sufficiency of the evidence supporting the termination of his parental rights pursuant to paragraphs (D) or (E).[5] Therefore, he has waived any challenge he may have to those findings. *See Toliver v. Texas Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Holloway does not challenge the sufficiency of the evidence supporting the findings under section 161.001(b)(1)(F), (N), and (O), and thus he waives any complaint about the sufficiency of the evidence to support these findings."); *see also In re T.W.*, No. 05-16-00232-CV, 2016 WL 3437589, at *6 (Tex. App.—Dallas June 21, 2016, pet. denied) (mem. op.) ("Father has not challenged the sufficiency of the evidence to support these grounds and has thus waived any complaint that the evidence is insufficient to support those findings."). Only one statutory ground is necessary to support a judgment in a parental rights termination case. *Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 221 (Tex. App.—Austin 2013, no pet.) (citing *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003)). The district court's unchallenged finding as to the statutory grounds in paragraphs (D) and

---

[5] In his reply brief M.V. maintains that he did not waive his objections to the termination of his parental rights on (D) or (E) grounds. M.V. did not, however, provide any briefing to support a challenge to termination of his parental rights on either of those grounds. Instead, M.V. states in his brief that "[h]ere the (O) ground is the only ground that has a strong argument. The Trial Court could not have gotten to termination on an analysis of (D) and (E), because the evidence for those is weak." M.V. has failed to adequately brief this issue. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

(E) are binding on appeal. *See, e.g.*, *In re E.A.F.*, 424 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Because the unchallenged findings can support the order of termination, it is unnecessary to review the legal sufficiency argument as to the finding with respect to paragraph (O). We overrule M.V.'s first issue.

In his second issue, M.V. challenges the factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in the children's best interest. When evidence sufficiency grounds are asserted on appeal, we must apply a standard of review that reflects the clear and convincing burden of proof. *In re J.F.C.*, 96 S.W.3d 256, 264-66 (Tex. 2002). In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable factfinder could have reasonably resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

Several factors are pertinent to the best-interest inquiry, including (1) the child's desires, (2) the child's present and future physical and emotional needs, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the person seeking custody, (5) the programs available to assist these individuals in promoting the child's best interest, (6) plans for the child by these individuals or the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is

4

presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment").[6]

With these guidelines in mind, we consider the evidence adduced at trial in light of the *Holley* factors.

### *Desires of the children and stability of proposed placement*

Department caseworker Erin Larson testified that since February 2018, I.G. and J.V. have been living with foster parents and are doing well. The boys had trouble adjusting at first because they were unaccustomed to having rules and set times to go to bed and get up. Larson testified that they have grown comfortable in their foster placement. Larson testified that their foster mother is engaged with the boys' education and is a very experienced foster parent. The boys are bonded to their foster mother, Tonika Wade. Wade testified that when I.G. and J.V. first arrived, I.G. had a tendency to "parent" J.V. Both boys had difficulty understanding

---

[6] The factors identified in section 263.307 of the Texas Family Code include: (1) a child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after an initial report and intervention; (5) whether the child is afraid to return home; (6) the results of psychiatric, psychological, or developmental evaluations of the child; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm has been identified; (10) the willingness of the child's family to seek out, accept, and complete counseling and cooperate with supervising agencies; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child with adequate health and nutritional care, care and nurturance consistent with the child's development, guidance and supervision for the child's safety, a safe physical home environment, protection from exposure to violence even if not directed at the child, and an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. Tex. Fam. Code § 263.307(b).

5

that they had to follow rules at home, but they are not struggling with that anymore. They are now working within the structure and routine set up by their foster parents. Wade stated that J.V. is doing very well in school and recently received an honor roll certificate as well as recognition for perfect attendance. Both I.G. and J.V. are happy and enjoy school. Wade testified that she has taken the boys on trips and tried to give them the experiences they have not had up to this point. Significantly, Wade has addressed the dynamic of I.G. feeling that he needed to take care of J.V. I.G. expressed that he liked being in the foster home where he was not responsible for caring for his younger siblings.

Wade testified that when J.V. arrived at her home he had serious behavioral problems and would throw things, have temper tantrums, and run away when he did not get his way. Wade stated that J.V. is very smart and often was not challenged at school, which caused him to act out. J.V. has started taking medication that has drastically improved his behavior and has been tested for the gifted and talented program at school. Wade also described how she manages J.V.'s behavioral issues by putting him in timeout or by giving him a puzzle or workbook to redirect him. Wade stated that she will take J.V. aside to talk about his frustration and why he acted out. Wade currently has very few disciplinary issues with J.V. Wade testified that, although she has no plans to adopt the boys, she would like them to stay at her home as long as possible and does not want them to move from place to place. Wade stated that although J.V. wanted to go home when he first arrived, he has expressed a desire to stay in the foster home. Wade testified that I.G. has expressed that he misses his mother, but that neither of the boys has asked to see M.V.

At the time of trial, M.V. was in ICE custody, and the outcome of his pending immigration case was unclear. Larson expressed concern that, if M.V. were deported, there were

no family members with whom the children could live. The boys' mother's parental rights were being terminated and their aunt had a pending case with the Department. Although M.V. mentioned at trial that he had an aunt in Arizona, he had not provided contact information to the Department and had not himself tried to contact her about caring for the children in his absence. Larson expressed concerns that, in the event he is not deported, M.V. would not be able to provide a stable home environment for the children. M.V. was not engaged in the children's education, claimed to be unaware of C.S.'s daily marihuana use, and was permitting the boys to take care of their infant sister. Larson testified that J.V. and S.V. have a right to a stable home, and that J.V. is "tormented and conflicted" not knowing where he is going to live. Larson opined that termination of M.V.'s parental rights was in J.V.'s best interest because he could remain in a home with an engaged parent who helped him with his homework and his behavioral issues.

S.V. has been with her current foster placement since May 2018. Larson testified that the placement is going well and S.V. is thriving. S.V. is bonded with her foster parents. When she was removed by the Department as an eight-month-old child, S.V. was overweight, was not interactive, and did not engage with her surroundings. She did not crawl and if left alone in a room she would scream and cry. Larson was concerned that S.V. did not cry when her diaper needed to be changed. Larson stated that S.V. is currently meeting her developmental milestones and is learning quickly, and her foster parents would like to adopt her.

Robin Yanez, S.V.'s foster mother, testified that when S.V. arrived at her home she was nonverbal and just sat there. S.V. did not communicate when her diaper was dirty, which Yanez and S.V.'s pediatrician attributed to S.V.'s having been accustomed to wearing a dirty diaper. Yanez also expressed concern that S.V. lacked any "stranger danger," and would go to anyone who put their arms out to her. Yanez was taken aback by how easily S.V.

7

transitioned to living in a new home and that being in a strange environment did not faze her at all. When she arrived, S.V. had no motor skills and did not know how to stack rings or blocks. Yanez has been working with S.V., and she is developing those skills. S.V. can work on simple puzzles and stack things, is starting to be verbal, and can walk and run. Yanez stated that S.V. is learning to be wary of people she does not know. S.V. goes to daycare while Yanez and her husband are at work, and Yanez stated that S.V. loves her daycare. Yanez testified that she and her husband would like to adopt S.V.

Larson expressed her opinion that all three children are progressing and overcoming behavioral and developmental obstacles in their foster placements. In her opinion, it would not be in the children's best interest to return them to an unstable home but that they should instead remain in a stable foster home where they can "move on with their lives" with the support they need.

### Plans for the children and available programs

The Department's plan for J.V. is for him to remain with his brother in his current foster placement. The plan for S.V. is for her to be adopted by her foster placement. Both foster mothers testified that they intend to facilitate visits among the siblings in the future. J.V. is receiving therapy and medical attention while in foster care to address his behavior issues. J.V. is also being tested for placement in a gifted and talented program at his school.

M.V. testified about his plans for the children. M.V. stated that he had been in ICE custody for seven months but is fighting his immigration case so he can get his children back. M.V. could not, however, say where the children would go if they were returned to him since they could not stay with him in the detention center. M.V. testified at trial that he had

8

friends or family members he would like the Department to consider placing the children with but did not have their contact information and had not attempted to contact them. M.V. requested that the Department give him more time to see what happens with his immigration case. M.V. agreed that it was not in the children's best interest to be unsure of where they would live but that he believed it was in their best interest that he "remain their father."

### *Parental abilities of person seeking custody*

Larson testified that the children were removed from C.S. and M.V.'s care because of concerns about C.S.'s drug use. Larson met M.V. in February 2018 at which time he denied knowing that C.S. was using marihuana. Larson expressed concern that M.V. had not intervened or realized that C.S. was frequently under the influence of drugs and was leaving the boys to care for S.V., who was eight months old. I.G. made an outcry statement about M.V. drinking alcohol while driving with the boys in the car. The Department developed a service plan for M.V. that included a psychological evaluation, substance abuse evaluation (OSAR), individual therapy, and parenting classes. The goal of the Department's service plan was to address M.V.'s lack of awareness of the children's environment and help him become a more active and safe parent for the children. Although M.V. testified that he did not leave the children home alone, Larson stated that she did not believe M.V. was being truthful. She based that opinion on the fact that the boys had told her they were often left alone to care for S.V. and had no reason to lie to her about that.

Although M.V. completed an initial psychological evaluation, he did not start following the recommendations from that evaluation before June 2018 (when he was taken into ICE custody). M.V. also did not complete an OSAR evaluation despite the Department's having

arranged for one. M.V. started but did not complete parenting classes. Larson also testified that there was no realistic possibility for M.V., while in ICE custody, to complete the services the Department believed he needed to improve his ability to be a safe and protective parent. Larson expressed concern about M.V.'s ability to provide an adequate social support system for himself or the three children.

M.V. testified that he knew C.S. used marihuana but denied that she did so when she was around the children. He also denied drinking and driving with the boys and expressed surprise that J.V. would say that he had. M.V. stated that the children were happy and healthy when they were with him and C.S. and that he would have done something about it if they were not. M.V. testified that C.S. was always there for the children making sure that they attended school and respected people. M.V. testified that he helped the children with their homework and made sure that they went to the doctor on a regular basis. M.V. testified that before he was taken into custody, he worked hard to support the children. M.V. denied that he left the children alone or that he rewarded the boys with video games for taking care of their sister.

***Emotional and physical needs of the children/emotional and physical danger to the children***

Larson testified extensively about what she believed to be past emotional and physical danger to the children resulting from C.S.'s drug use and M.V.'s failure to intervene and be proactive about the children's care. The boys were missing school and were sometimes not clean when they went to school. The Department learned that C.S. frequently smoked marihuana and left the children on their own. I.G. testified that M.V. drank alcohol while driving the boys in the car and that the boys were often left to care for S.V. Larson was concerned that M.V. lived in the home full time and was unaware of C.S.'s drug use. J.V. reported to Larson an

10

incident when he, a six-year-old, was charged with watching S.V. but instead J.V. unsurprisingly played video games. During that time S.V. fell and hit her head. The boys told Larson that they had a plan in the event someone came to the door while they were taking care of S.V. to turn off the television and the lights, lock the door, and hide in cabinets, a closet, or the bathtub. Larson testified that leaving the children alone endangered them.

Larson testified that it was emotionally endangering to have the boys responsible for taking care of their infant sister and that it was unfair to put them in that situation. Larson stated that she did not believe that M.V. was being truthful when he denied that the children were left alone or that he rewarded the boys with video games for taking care of S.V. S.V.'s foster mother testified that when S.V. first arrived at the Yanez home, she was noncommunicative and did not walk or crawl. I.G. was behind in school and J.V. had serious behavioral problems including temper tantrums and unwillingness to follow rules. These behavioral issues greatly diminished once the children were in their foster placements and receiving therapy and attention. Larson testified about the harm to the children's emotional well-being that resulted from being left alone with a parent who was frequently under the influence of drugs.

Prospectively, Larson expressed concern about whether M.V. was willing to make positive changes in his life and whether he could develop adequate parenting skills. Larson testified that the children's emotional needs are in danger while they struggle with not knowing where they will live in the future.

M.V. denied that the children were left alone or that C.S. used drugs in their presence. He also denied engaging in any conduct that would endanger the children and stated that he did not abandon them. According to M.V., the children were happy, healthy, and well cared for before they were removed and placed in the Department's custody.

11

There is a strong presumption that a child's best interest will be served by preserving the parent-child relationship, *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), and parental rights may not be terminated merely because a child might be better off living somewhere else, *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Nevertheless, a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered. *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39. In considering a child's present and future emotional and physical needs, the need for permanence is of paramount importance, and in the end, if there are competing interests, a parent's interest must yield to the child's best interest. *See Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86-87 (Tex. App.—Dallas 1995, no writ).

Considering the evidence in light of the *Holley* factors, and giving full consideration to the disputed and undisputed evidence and inferences, we hold that the record contains sufficient evidence for a reasonable factfinder to form a firm conviction or belief that termination of M.V.'s parental rights is in the children's best interests. Based on the evidence, the trial court could properly conclude by clear and convincing evidence that: (1) the children's desire is to remain in their current placements, which are stable and safe environments; (2) the plans for the children and programs available to them in their current placements are in their best interest, especially since M.V. was unable to state where the children would live if they were returned to him or in the event he is deported; (3) M.V. lacks the parenting abilities necessary to provide a safe and stable environment for the children, including the ability to recognize when

12

the children's living situation is endangering them; and (4) M.V.'s conduct—acts and omissions—have endangered the children's physical and emotional well-being in the past and will likely continue to endanger their physical and emotional well-being in the future if the children are returned to him. Considering the entire record, we conclude that any disputed evidence could have been reconciled in favor of the court's findings, such that the court could have formed a firm belief or conviction that termination of M.V.'s parental rights was in the children's best interests. Thus, the evidence in this record is factually sufficient to support the court's best interest finding under section 161.001(b)(2) of the Texas Family Code. We overrule M.V.'s second issue.

## CONCLUSION

For the reasons stated, we affirm the trial court's judgment terminating M.V.'s parental rights to J.V. and S.V.

_____

Chari L. Kelly, Justice

Before Chief Justice Rose, Justices Kelly and Smith

Affirmed

Filed:  June 19, 2019

13