

# NUMBER 13-25-00145-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF O.J.G. AND O.E.G., CHILDREN

## ON APPEAL FROM THE 36TH DISTRICT COURT
## OF BEE COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Cron**
**Memorandum Opinion by Justice Cron**

Appellant J.G. (Mother) appeals a judgment terminating her parental rights to her children, O.J.G. and O.E.G.[1] Mother argues that the evidence is legally and factually insufficient to support: (1) termination pursuant to § 161.001(b)(1)(O), and (2) that termination was in the children's best interest.[2] We affirm.

---

[1] We refer to the parties and children by their initials in accordance with the rules of appellate procedure. TEX. R. APP. P. 9.8(b)(2).

[2] Mother was the sole party to this appeal.

## I. BACKGROUND

### A. Pre-Trial

On August 1, 2023, the Department of Family and Protective Services (Department) filed a petition seeking to terminate Mother's parental rights to O.J.G., who was eleven at the time of trial, and O.E.G., who was approximately eighteen months old at the time of trial. The petition was supported by an affidavit that alleged neglectful supervision by Mother. According to the affidavit, Mother went to the hospital because her water broke but she refused medical treatment and left the hospital against medical advice. She later returned and gave birth to O.E.G, and both she and O.E.G. tested positive for methamphetamines. Additionally, according to the affidavit, O.E.G.'s alleged father was abusive toward Mother, and there was a concern that O.J.G. feels the pressure of taking care of Mother and O.E.G.

Subsequently, the Department was awarded temporary managing conservatorship of the children on August 15, 2023, and the case later proceeded to a bench trial via zoom on January 24, 2025, and February 25, 2025.

### B. Trial Record

After admitting nine exhibits, the Department called Lionel Vasquez to the stand.[3] Vasquez, an investigator with the Department, testified that the children came to the Department's attention because Mother and O.E.G. tested positive for methamphetamines when O.E.G. was born. During its investigation, the Department also

---

[3] The nine exhibits are the original petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship, the affidavit in support of emergency removal, temporary order following adversary hearing, the status hearing order, three family plans (to include one for J.G., Mother), the permanency report to the court, and the guardian ad litem's report to the court.

obtained the results of the meconium test which were positive for methamphetamines. The Department received another intake that O.J.G., nine years old at the time, was acting as O.E.G.'s caretaker.

Initially, Vasquez explained, the Department tried to avoid removal by offering Mother services through Family-Based Safety Services (FBSS)[4] and to put in place a safety plan that included a 24-hour monitor. However, the attempted safety plan failed because Mother was unable to provide a monitor. This, coupled with the positive drug test results, lead the Department to seek removal of the children. Vasquez confirmed that Mother's significant history of cases and reports against her were also a consideration favoring removal. Vasquez clarified that he believed the Department had been working on and off with Mother since 2013, and in the past she had been able to complete a family plan of service for reunification.

Next, Taylor Jones, a Department caseworker,[5] testified that the case had been ongoing for nineteen months, and Mother had not substantially complied with her court-ordered family plan of service, with the primary components of such plan being individual counseling, drug counseling, and parenting classes. Mother's service plan also required random hair follicle, urine, and oral swab drug testing. Jones stated that the Department's primary concern with Mother is her use of methamphetamines. Although Mother was

---

[4] Family-Based Safety Services (FBSS) are designed to maintain children safely in their homes— or make it possible for children to return home—by strengthening the ability of families to protect their children and reducing threats to their safety. *See* Family-Based Safety Services (FBSS), Texas Department of Family and Protective Services, https://www.dfps.texas.gov/child_protection/Family_Support/FBSS.asp (last visited June 26, 2025).

[5] Taylor Jones testified that there have been three caseworkers assigned to this case. She initially handled the case followed by two after her, and then she returned to the case.

3

offered rehab at the beginning of the case, in August of 2023, she did not attend until nearly the end, in December of 2024.

Regarding drug testing, Jones explained that Mother failed six out of the ten urine tests and four out of five hair follicle tests. She refused two oral swabs and was positive on one. Jones clarified that Mother was offered eight hair follicle tests but only took five. During the pendency of the case, Mother became pregnant again,[6] and admitted that she used drugs during her pregnancy. Mother also admitted to using drugs in early December of 2024.

On cross-examination, Jones stated that just before entering rehab on December 10, 2024, Mother tested positive on a urine test for methamphetamines, benzodiazepines, and amphetamines. But she acknowledged that Mother was negative on a urine test before trial. Jones also explained that Mother expressed interest in continuing her residential treatment beyond thirty days in effort to show that she was attempting to sustain sobriety, but there were no beds available to prolong her stay. Also, since being discharged from residential treatment, Mother has participated in outpatient treatment with A.G.[7] at home with her, and she completed three individual sessions and fifteen group sessions.

Believing termination to be in the best interest of the children, Jones recommended that all parental rights be terminated and that the children remain at their current placement with the Morris family, which would like to adopt them. Jones stated that O.J.G. had been placed with the Morris family previously, and the children have now been with

---

[6] Mother gave birth to another child (A.G.) during the case.

[7] A.G. is not a party to the suit.

them for approximately nine months. They are "thriving," "happy," and "healthy" with the Morris family, and the placement is stable, safe, and drug free. O.J.G. was doing well in school and getting "straight A's." According to Jones, O.J.G. desires to remain with the Morris family and be adopted by them. O.J.G. loves Mother but he does not want to return to live with her. Jones clarified that O.J.G. has not indicated that he never wanted to see his Mother again but when asked about how he feels about the possibility of having no more visits with her, he stated he would "feel fine" about that.

Jones also explained that Mother has been participating in a battering intervention program for approximately a month and a half as O.E.G.'s alleged father had a history of being abusive to Mother and "then her with [O.J.G.'s father]." Jones observed some police call outs to Mother's home during her review of the case, but she believed if it was a call out from Mother it was to have O.E.G.'s alleged father leave the home. Jones also explained that after visits were decreased with Mother at one point they did not increase because there was a period of time in which Mother would confirm and then cancel last minute or not show.

On direct questioning from the trial court, Jones clarified that Mother admitted to using after A.G. was born in November 2024 but before entering rehab on December 10. She also clarified that although Mother completed drug counseling in April of 2024, she was either not testing or testing positive for the Department so she was referred to another provider to resume drug classes. However, Mother did not fully complete the classes. Additionally, Jones explained that Mother was not fully compliant with her individual counseling since she sporadically attended. She further explained that Mother completed parenting classes but had been recommended to go back. Jones confirmed that the

5

Department made monthly attempts to visit Mother's home, but it was only able to view it on seven occasions despite the case pending for nineteen months. She explained that Mother would either not respond to their knock or call, or she would schedule with them and then cancel.

Next, O.J.G.'s father, A.T. testified.[8] He stated that he would like the children to remain with the Morris family and believes O.J.G. will have a good home with them. He confirmed that he signed an affidavit of relinquishment with respect to O.J.G., and that he believes it would be in the best interest of O.J.G. that his parental rights be terminated so that an adoption can take place. Additionally, he testified that he believes it to be in O.J.G.'s best interest that Mother's rights be terminated as well.

Mother testified next on direct and confirmed that in the past she has been able to successfully complete family service plans, but she was unable to do so this time. Mother also testified that since completing rehab she has been "doing great" but conceded that she previously used methamphetamines. She also conceded that using drugs while pregnant with her youngest child was not safe. Mother acknowledged that she had not completed her service plan because she "had a drug addiction" and "needed help." Since receiving that help, she said she feels that she has been completing the service plan, but apologized for not going to rehab sooner. Mother also stated that she does not think her children should have waited at all for her to get drug free, "[a]nd there are no excuses. There aren't any whatsoever."

Brittany Morris testified next that she has known Mother and O.J.G.'s father for eleven years. Morris stated that O.J.G. was previously placed in her home for about five

---

[8] We observe the record implies that A.T. was in custody during his testimony.

years and knows her family well. She stated O.J.G. and O.E.G. are doing excellent. Morris confirmed that she and her husband would like to adopt the children and explained that "it's been [eleven] years, I think, of O.J.G. back and forth between [the Department] and his mom. I think it's—it's been enough for this child." Morris further explained that she does not believe going back and forth is in O.J.G.'s best interest because "it's really hurt him. He—he's struggling to just know that he's—good, he's safe, he's loved, he's taken care of. And he doesn't have to worry about when his next meal is going to come from and if he's going to be able to go to school the next day."

Upon being recalled, Mother testified that she has maintained her same residence for ten years with O.E.G. living there for "like a night" and O.J.G. the "whole time." Currently, she and A.G. live in the home, and she pays gas, electric and water. Mother explained she also has two older children, aged sixteen and seventeen, that reside with their father in San Antonio, but she nonetheless maintains a relationship with them, and her daughter will be moving in with her over the summer.

Mother stated she had been cleaning houses and cutting grass to pay her bills and take care of herself and her children. Before rehab, she explained that it had been "a little bit more difficult due to my anemia," as it impacted her ability to do things. Additionally, Mother confirmed that at times the people she relied on to drive her to visits with her children did not show or could not come. Mother could not drive herself because she never owned a car. Mother denied refusing the Department entry into her home and explained she was working, not available, or her phone was not working when the Department called.

7

Mother confirmed that she has admitted to having a methamphetamine addiction and had not been forthcoming in the past. Mother explained that challenges she faced that prevented her from going to residential treatment at the end of the summertime were her bills and finding a home for her three pets. She further explained that if she did not pay her bills she would not have had electricity. She was also concerned that if she did not have electricity, then A.G. would be removed. She also explained that it took four months to find a home for her pets.

Mother stated that residential treatment has made a great difference in her life, and she was blessed to be able to take A.G. with her. She also stated that she participated in every resource and attended every group session. She explained that the first drug test taken when she entered was positive but never again during her stay. She stated she attempted to stay longer than thirty days, which was reported to the trial court, but believed a miscommunication prevented her from staying longer. Mother testified that after discharge she diligently participated in online outpatient lessons.

Explaining her current pathway, Mother acknowledged she has not been accountable in the past due to her drug addiction. Since completing rehab, however, she has seen a big change in herself and has obtained valuable learning tools, such as learning to understand her triggers. Additionally, a significant person that Mother lost at the start of this case was her own mother. Mother has since developed some support from friends and family, and she has a recovery coach. Mother acknowledged that there is not much of a record of her recent behavior change, but she asked that she not be removed from her children's lives. She apologized for the length of time it has taken and recognized that O.J.G. and O.E.G. need stability and safety. Mother said she is not asking

8

that the children be removed from the care of the Morris family but to consider an option less than termination.

Mother admitted four exhibits into evidence: a discharge plan from Santa Maria,[9] that reflects Mother achieved several discharge objectives; a client progress report from Santa Maria that states among other things that "[Mother's] attendance and participation has been consistent"; a message showing that since re-enrolling Mother has been attending a battering intervention program and has missed only one class; and four certificates showing program course completions for relapse prevention and intensive outpatient treatment (on April 29, 2024), individual counseling (on February 16, 2024), and parenting (on September 27, 2023).

Lastly, Amie Gaitan, the guardian ad litem (GAL), testified that she has been serving as the GAL for about a year, and she believes it is in the children's best interest to remain with the Morris family and that parental rights be terminated. Gaitan explained that while Mother believes she has good intentions, she "does things on her terms and on her time." Gaitan also explained that when she was at Santa Maria during a visit with the children, Mother made it very clear that she was going to go home and that she had to go home so that she could maintain her housing assistance. Mother, she explained, stated that she could not stay in rehab because maintaining her housing assistance where she was living outside of rehab required that she and A.G. be physically present there, but Gaitan verified with the housing authority that there was no such requirement. In other

---

[9] We observe Santa Maria is where Mother went for inpatient residential treatment or stated differently, rehab.

9

words, Gaitan explained it was just another excuse for Mother to go home and not complete ninety days of rehab, as required by the trial court.

Gaitan testified that "[O.J.G.] is very mature for his age." Additionally, she described two incidents in which she observed O.J.G. "shut down" around Mother. Gaitan also explained that the main concern with Mother was her drug use. With regards to visits to Mother's home, she explained that she and the Department would show up at Mother's home after getting her approval to go, and then Mother would not allow them in the home. On one occasion Gaitan was able to view the home, and she had concerns because all the windows were covered, apart from the front door that did not securely lock, and the other doors had furniture in front of them. At a certain point, Gaitan stopped trying to see the home because Mother was very negative and said Gaitan's visits were causing undue stress on her child. Gaitan explained that Mother had so many excuses for why she would not go to rebab that Gaitan had to start tracking them. The excuses mostly related to her pets and utilities but also included Mother not wanting to travel to Houston, doing things for her baby, packing her stuff, cleaning her yard, mowing the grass, and not wanting to share a room with other females who had been incarcerated.

On cross-examination, Gaitan testified that she believes visits with Mother would be detrimental for O.J.G. Gaitan stated that O.J.G. has requested that he would just like to know that Mother is "okay" and that he is in "total agreement with the idea of adoption." Additionally, Gaitan testified that she personally believes it is the children's best interest to be adopted by the Morris family and to have no contact with Mother. She also confirmed that it would be detrimental to the children's development to allow Mother to have some

kind of visitation schedule with the children if the trial court were to terminate Mother's parental rights.

## C.    Ruling

At the close of evidence, the trial court took the matter under advisement. On March 18, 2025, the trial court entered an order terminating Mother's parental rights to O.J.G. and O.E.G. pursuant to predicate grounds (D), (E), and (O). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). The trial court also found that termination was in the children's best interest. *See id*. § 161.001(b)(2). This accelerated appeal followed. *See* TEX. R. APP. P. 28.4.

## II.    STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights, *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985), and consequently, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In parental termination proceedings, our legal and factual sufficiency standards honor this elevated burden of proof while respecting the factfinder's role. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

Where the distinction lies between legal and factual sufficiency is in the extent to which disputed evidence contrary to a finding may be considered. *Id*. When conducting a legal-sufficiency review, a "reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id*. at 630–31. Therefore, "[e]vidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the

11

finding was true." *Id.* at 631.

On the other hand, factual sufficiency "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding" in a factual-sufficiency review. *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*. Under both legal and factual sufficiency standards, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see also In re I.R.*, No. 13-24-00632-CV, 2025 WL1261430, at *6 (Tex. App.—Corpus Christi–Edinburg May 1, 2025, no pet.) (mem. op.) (citations omitted).

A trier of fact must find two elements by clear and convincing evidence before it can involuntarily terminate parental rights: (1) that a parent's act or omission satisfies a statutory ground for termination found in § 161.001(b)(1) of the Family Code; and (2) that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1), (2); *In re J.P.B.*, 180 S.W.3d at 572. Clear and convincing evidence means "the degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. "In a bench trial, the trial court acts as the fact-finder and is the sole judge of witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citing *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)).

12

### III. TERMINATION GROUNDS

In her first issue, Mother argues there is legally and factually insufficient evidence supporting termination of her parental rights under § 161.001(b)(1)(O) because she completed all material portions of her service plan by the time of trial, was free of drugs, attended counseling, and provided a safe and stable home for another child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O). The Department responds that Mother has waived this complaint.

### A. Applicable Law & Analysis

Because "only one predicate ground is necessary to support a judgment for termination," *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022); *see* TEX. FAM. CODE ANN. § 161.001(b), a parent who hopes to prevail on the first statutory element must successfully challenge each predicate finding by the trial court. *See In re J.G.S.*, 574 S.W.3d 101, 115 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). If, however, a parent challenges a child-endangerment ground, due process mandates review of such ground regardless of whether there are other predicate grounds to support termination. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) ("Allowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights."); *see also In re I.R.*, 2025 WL 1261430, at *6 ("Although only one predicate ground is necessary to support termination, when the parent has preserved error as to Subsections (D) and (E), concerning endangerment, we must review those grounds as a matter of due process.").

Here, Mother has not presented a challenge on appeal to the child-endangerment predicate grounds found by the trial court. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D),

(E). Thus, Mother has forfeited any challenge she may have to those findings. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E); *Toliver v. Texas Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Holloway does not challenge the sufficiency of the evidence supporting the findings under [§] 161.001(1)(F), (N), and (O), and thus he waives any complaint about the sufficiency of the evidence to support these findings."); *see also In re A.M.L.*, No. 13-17-00451-CV, 2017 WL 6545995, at *3 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2017, no pet.) (mem. op.) (similar); *J.T. v. Texas Dep't of Family & Protective Servs.*, No. 03-15-00286-CV, 2015 WL 6459607, at *2 (Tex. App.—Austin Oct. 23, 2015, no pet.) (mem. op.) (similar).

Because we may affirm the trial court's judgment of termination on the unchallenged (D) and (E) grounds, it is unnecessary for this Court to review Mother's sufficiency challenge to predicate ground (O). *See In re J.G.S.*, 574 S.W.3d at 115 ("[I]f multiple predicate grounds are found by the trial court, we may affirm on any one ground because only one is necessary for termination of parental rights." (citation omitted)); *see also In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.) (unnecessary to review sufficiency arguments as to other grounds of termination when trial court's finding with respect to unchallenged ground can support termination order); *see generally*, *In re A.A.*, No. 10-24-00084-CV, 2024 WL 3717427, at *1 (Tex. App.—Waco Aug. 8, 2024, pet. denied) (mem. op.) (refusing to analyze Mother's challenge to subsection (D) in light of unchallenged (E) finding); *C.W. v. Tex. Dep't of Family & Protective Servs.,* No. 03-19-00654-CV, 2020 WL 828673, at *2 (Tex. App.—Austin Feb. 20, 2020, no pet.) (mem. op.) ("[W]e need not review Father's challenge under Subsection (D) because the potential

collateral consequences are triggered separately by the Subsection (E) portion of the trial court's judgment, which he does not challenge." (citation omitted)). Accordingly, we overrule Mother's first issue. *See* TEX. R. APP. P. 47.1.

## IV.    BEST INTEREST

In her second issue, Mother argues there is legally and factually insufficient evidence to find that termination was in the best interest of the children because Mother completed all the material portions of her service plan and was providing a safe and stable home for another child. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). The Department disagrees asserting that termination was in the best interest of the children.

### A.    Applicable Law

"'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013). It is child-centered and focuses on the well-being, safety, and development of the child. *In re A.C.*, 560 S.W.3d at 631. In *Holley*, the Supreme Court identified several nonexclusive factors for courts to consider in determining the children's best interest. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). They include: (1) the children's desires; (2) the children's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the children; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the children's best interest; (6) the plans for the children by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one; and (9) any excuse for the parent's acts or

15

omissions. *Id*. at 372. "With respect to the best interest of a child, no unique set of factors need be proved." *In re M.N.M.*, 708 S.W.3d 321, 325 (Tex. App.—Eastland 2025, pet. denied). "In analyzing these factors, the court must focus on the best interest of the child, not the best interest of the parent." *In re E.J.M.*, 673 S.W.3d 310, 333 (Tex. App.—San Antonio 2023, no pet.) (en banc) (citation omitted). We may also consider the statutory factors in § 263.307 of the Family Code. *See* TEX. FAM. CODE ANN. § 263.307.

## B. Analysis

As to the first *Holley* factor, O.E.G. was approximately eighteen months old when Mother's rights were terminated, and thus, she was too young to express her desires. *See In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("[T]he general rule is that when a child is too young to express herself, her desires are neutral as to the trial court's best-interest finding, unless there is circumstantial evidence from which the factfinder could infer her desires by proxy."). It is undisputed that both children are well taken care of in their current placement with the Morris family. *See Holley*, 544 S.W.2d at 372; *see also In re A.M.V.*, No. 04-25-00070-CV, 2025 WL 1512211, at *6 (Tex. App.—San Antonio May 28, 2025, no. pet. h.) (mem. op.) (explaining that in circumstances in which the child is young, "courts . . . have held a fact finder may consider whether the child has bonded with the foster family, is well cared for by them, and has spent minimal time with the parent" (citations omitted)).

O.J.G., eleven years old at the time of trial, did not testify himself but Gaitan testified that he is "very mature for his age" and she and Jones conveyed his wishes of adoption by the Morris family. *See generally, In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) ("[A] child's preference should not be considered absent

a showing of sufficient maturity . . . and there was no indication that any of the children were sufficiently mature to express a preference as to their placement."(internal citation omitted)); s*ee also In re C.J.A*., No. 13-16-00635-CV, 2017 WL 2200301, at *4 (Tex. App.—Corpus Christi–Edinburg March 16, 2017, no pet.) (explaining, among other things, upon analyzing first *Holley* factor, that "[t]here was no evidence that [the seven-year-old child] expressed an opinion regarding his desires about his relationship with [father] or that he was mature enough to form one"). More specifically, according to Jones, O.J.G. expressed his desire to remain with the Morris family and be adopted by them, and while he loves Mother, he does not want to return to live with her. Additionally, he would "feel fine" about having no more visits with her. Similarly, Gaitan stated that O.J.G. has only requested to know "if [Mother is] okay," but he is "in total agreement with the idea of adoption." Accordingly, the first factor supports termination.

It was uncontroverted at trial that, despite her parental rights being at stake, Mother continued to use illicit drugs from inception to nearly the end of the case, which supports the trial court's best interest finding under the second, third, and fourth *Holley* factors. *See Holley*, 544 S.W.2d at 372. Specifically, the record showed Mother and O.E.G. testified positive for methamphetamines at birth, and Mother admitted to the Department's caseworker that she was still using drugs sixteen months later. *See In re E.D.*, 682 S.W.3d 595, 608 (Tex. App.—Houston [1st Dist.] Nov. 16, 2023, pet. denied) ("A mother's use of illegal drugs during pregnancy endangers the physical wellbeing of her unborn child."); *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] Feb. 5, 2019, pet. denied) ("[P]arental substance abuse reflects poor judgment and may be a factor to consider in determining a child's best interest."); *see also* TEX. FAM. CODE ANN. § 263.307(b)(8)

17

(listing as best-interest consideration: courts may consider history of substance abuse by a child's family or others who have access to a child's home); *In re J.V.*, No. 02-19-00392-CV, 2020 WL 1540865, at *6 (Tex. App.—Fort Worth Apr. 1, 2020, no pet.) (mem. op.) (finding the second and third *Holley* factors weigh in favor of termination after discussing Mother's history of drug use, including methamphetamine use, after her child's removal among other things).

Mother asserts in her brief that "it is difficult for the Department to argue that the children would be in danger in [Mother's] care when they have found A.G. is not in danger in her care." However, best interest determinations are made on a "child-by-child basis." *See In re E.D.*, 682 S.W.3d at 611–12 (rejecting Mother's suggestion that termination of her rights with respect to her younger son but not her older son would be inappropriate after explaining in part that "best-interest determinations must be made individually, on a child-by-child basis, even with respect to children in the same family") (citing *In re A.J.D.- J.*, 667 S.W.3d at 835).

Additionally, testimony from Jones showed that while Mother was at times drug testing for the Department, she was positive on six of the ten urine tests, four of the five hair follicle tests, one of three oral swabs, and she refused to take the other two. And while Mother testified to "doing great" since rehab she conceded to having a drug addiction, and using methamphetamines, a more "destructive" drug than others, during the case. *Id*. at 608 (explaining that the evidence shows that mother's drug use involves "so-called hard drugs—cocaine and methamphetamine in particular—rather than less destructive ones"). Accordingly, the second, third, and fourth factors weigh in favor of termination.

18

Relevant to the fifth factor, Mother admitted four certificates into evidence showing completion of relapse prevention, intensive outpatient treatment, individual counseling, and parenting classes. However, even assuming the trial court credited Mother with completion of parenting classes and individual counseling, the certificates for both relapse prevention and intensive outpatient treatment reflect a completion date of April 29, 2024. The undisputed testimony revealed that Mother was using after this time period. *See id.* ("When . . . the evidence shows the parent returned to drug use after rehabilitation, the factfinder may reasonably find that the parent will, in all likelihood, continue using drugs and therefore continues to pose a risk to his or her child's well being." (citation omitted)). Additionally, while Mother's decision to enter rehab and engage in outpatient treatment services upon discharge is commendable, of significance, the record shows this decision came less than two months shy of the dismissal date. *See* TEX. FAM. CODE ANN.§ 263.401(a), (b); *In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *see also In re A.M.R.*, 652 S.W.3d 117, 125 (Tex. App.—Waco 2022, pet. denied) (finding that the evidence was legally and factually sufficient for the jury to have found that termination was in the best interest of the child after explaining, among other things, that "Stephanie did not . . . make a significant effort to participate in services until well over a year after [the child's] removal and very late in the proceedings"); TEX. FAM. CODE ANN. § 263.307(b)(11) (listing "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time" as a best-interest factor). Accordingly, the fifth factor weigh in favor of termination.

Considering next the sixth and seventh *Holley* factors, the undisputed evidence showed that the children were thriving, happy, and healthy in their current placement with the Morris family and the family wanted to adopt them. Moreover, A.T. testified that he would like the children to remain with the Morris family and believes O.J.G. will have a good home with them. *See In re G.A.C.*, 499 S.W.3d 138, 141 (Tex. App.—Amarillo 2016, pet. denied) ("[A] child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in determining best interest." (citation omitted)). On the other hand, Mother clarified that she is not asking that the children be removed from the Morris family but that an option short of termination be considered. In her brief, she contends that her plan "gives the children the most hope and the most love; keep her rights open so that they can have a relationship with their mother and their sibling, A.G., without cutting the placement out of the children's lives." However, the Department presented evidence that Mother failed to show up for some scheduled visitation. And Mother did not deny missing visits either, but instead offered a reason for missing based on her means of transportation falling through. *See Holley*, 544 S.W.2d at 371–72; *see also In re A.V.G.-P.*, No. 10-23-00294-CV, 2024 WL 1327908, at *4 (Tex. App.—Waco Mar. 28, 2024, no pet.) (mem. op.) ("[A] parent's failure to regularly visit his children after removal may support a finding that termination of the parent's rights is in the children's best interest." (citation omitted)). Even if the trial court believed Mother's explanation, Gaitan testified that she believes continued visits with Mother after termination would be detrimental to the children's development and the trial court was free to believe her testimony over Mother's. *See In re R.J.*, 579 S.W.3d at 117 ("We note, that '[i]t is well established that, in a bench trial, the judge as the trier of fact weighs the

20

evidence, assesses the credibility of witnesses and resolves conflicts and inconsistencies.'" (citation omitted)). Given the above evidence, the trial court could have determined Mother's proposed plan was not in the children's best interest because it would inject instability into their lives. When considering the totality of the evidence, these factors too weigh in favor of termination.

Regarding the final two *Holley* factors, Mother testified that challenges she faced which prevented her from attending treatment earlier were her bills and finding housing for her three pets, and she asserts a similar argument, albeit phrased differently, on appeal. Gaitan testified that Mother had so many excuses that she began writing them down. The excuses mostly related to her pets and utilities but also included Mother not wanting to travel to Houston, doing things for her baby, packing her stuff, cleaning her yard, mowing the grass, and not wanting to share a room with other females who had been incarcerated. And upon being asked how long her children should have to wait for her to get drug free, Mother acknowledged she should have "gotten [her] stuff together since the beginning," she does not "think [her] children should have waited at all", and "there are no excuses." Given such conflicting testimony, the trial court was free to disbelieve Mother. *See id*.

We acknowledge that not all of the evidence is adverse to Mother. For example, she testified to: maintaining the same residence for ten years, obtaining a negative urine test before trial, completing thirty days of residential treatment, engaging in outpatient treatment, having A.G. remain in her care, and maintaining a relationship with her two older children. However, evidence cannot be read in isolation, and must be read in the context of the entire record. *See id*. at 119. And when viewing all of the evidence in the

21

light most favorable to the trial court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630. Further, the evidence to the contrary was not so significant as to preclude such a finding. *See In re A.C.*, 560 S.W.3d at 630. We thus hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship between Mother and the children was in their best interest, and we overrule Mother's second issue.

## V. CONCLUSION

The trial court's judgment is affirmed.

JENNY CRON
Justice

Delivered and filed on the
10th day of July, 2025.